**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Frank VISCEGLIA and Vincent Visceglia, t/a Peddie Buildings, Respondent.**

**No. 73-1704.**

United States Court of Appeals, Third Circuit.

Argued Feb. 28, 1974.

Decided May 21, 1974.

As Amended May 31, 1974.

44

Jay E. Shanklin, William H. DuRoss, III, Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Asst. Gen. Counsel, Elliott Moore, Deputy Asst. Gen. Counsel, N.L. R.B., for petitioner.

Edward F. Ryan, Irving L. Hurwitz, Carpenter, Bennett & Morrissey, Newark, N. J., for respondent.

Milton Smith, Richard B. Berman, Washington, D. C., Gerard C. Smetana, Jerry Kronenberg, Chicago, Ill., for amicus curiae, U. S. Chamber of Commerce.

Before HUNTER and WEIS, Circuit Judges, and BECKER, District Judge.

OPINION OF THE COURT

EDWARD R. BECKER, District Judge.

This is an application of the National Labor Relations Board (Board) pursuant to § 10(e) of the National Labor Relations Act (Act) [1] for enforcement of its unfair labor practice order issued on April 27, 1973, against Frank Visceglia and Vincent Visceglia, a limited partnership t/a Peddie Buildings (Respondent).[2] The issue presented is whether there is substantial evidence to support the Board's finding that Respondent violated § 8(a)(1) of the Act by threatening to cause the arrest of warehouse employees of American Hospital Supply

---

1. 29 U.S.C. § 160(e) (1970).

2. The Board's decision and order is reported at 203 NLRB No. 27, 83 LRRM 1066

(1973). The order required Respondent to cease and desist and to post notices.

Company, Inc. (American) for engaging in peaceful primary picketing on Respondent's privately owned industrial park property in support of an economic strike against American, where Respondent's private road provided the sole access to a warehouse that American leased from Respondent in the industrial park.

The Board's decision is bottomed upon the principles enunciated in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). While Babcock deals with organizational picketing, the Board nonetheless applies it to the primary economic picketing involved in this case. The Board concludes that under the Babcock balancing test, the private property rights of Respondent are outweighed by and therefore must yield to the rights asserted by the pickets under § 7 of the Act.[3] Respondent maintains that the principles of Babcock are inapplicable to the instant case, since an economic strike, not organizational activity, is involved. Respondent asserts a constitutionally protected right to limit access to its property in the context of this case. Alternatively, Respondent contends that its property rights still outweigh the pickets' rights, even if Babcock is applicable.

We now summarize the record as set forth by the Administrative Law Judge and relied upon by the Board. As will be seen, there is not substantial evidence to support the Board's decision, even assuming the applicability of the Babcock balancing test which constitutes the sole basis for the Board's decision and enforcement application. Hence, enforcement will be denied.

I.

Raritan Center·(the Center) is a large industrial park complex near Edison, New Jersey. The Center is owned, operated and controlled principally by two brothers, Frank and Vincent Visceglia. It consists of approximately 2350 acres, divided roughly into four quadrants, three of which were developed for sale to companies that erected their own buildings. The Visceglia brothers have retained the remaining sector, a 417 acre tract of land within the Center, which they operate as rental property in a limited partnership under the trade name of Peddie Buildings (Respondent). It is the Peddie sector which is involved in this case. At the time the dispute before us arose (April 1971), there were approximately 68 buildings in the Ped-

---

3. The Administrative Law Judge relied in part on Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), which held that a shopping center which was freely accessible and open to the public was deemed the functional equivalent of a community business block for First Amendment purposes. He concluded that the private road within this industrial park where the picketing at issue took place was akin to an industrial city street, which property right could therefore be circumscribed by the statutory and constitutional rights of these pickets. The Board, however, rejected the applicability of Logan Valley, for reasons expressed in Central Hardware Co. v. NLRB, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972), where the Supreme Court held that a sole proprietor's parking lot adjacent to his retail store was not "quasi public" like the Logan Valley shopping mall and that § 7 rather than constitutional principles should be applied in determining the

rights of organizational pickets to have access to the Central Hardware parking lot. In this appeal, the parties did not contest the Board's conclusion that Logan Valley is inapplicable and did not brief the issue. An amicus brief by the United States Chamber of Commerce does analyze the relationship to labor picketing in industrial parks of Logan Valley and the more recent cases of Central Hardware Co. v. NLRB, supra, and Lloyd Corporation, Ltd. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). The question whether Logan Valley applies to pickets (labor or others) in industrial parks is an important issue, and the direction which the law will take in this area is unclear. But see NLRB v. Solo Cup Company, 422 F.2d 1149 (7th Cir. 1970). However, we do not believe that the instant record requires us to reach this difficult problem. Nor are we bound to do so simply because an amicus brief raises the issue where the parties do not.

die sector.[4] The normal use of the Peddie sector by its tenants was nonretail.[5]

Raritan Center's northern boundary is Woodbridge Avenue, a public highway. The entire perimeter of the Center is fenced; the only entrance is located at the intersection of Woodbridge Avenue and Raritan Center Parkway. Raritan Center Parkway, also a public road, begins at Woodbridge Avenue and continues south within the industrial park confines for approximately one mile until it terminates at the Lehigh Valley Railroad tracks. Running east and west, these railroad tracks bisect the Center. On the other side of these tracks, a small private road begins and runs through the Peddie sector as the sole access road.[6] At the start of this private road there is a large sign reading "No Trespassing—Private Property, Entrance By Permit Only." On occasion this road is closed to all traffic by Respondent. Approximately 40% of the borders of the Peddie sector are fenced off from the remainder of Raritan Center, and Peddie intends to enclose the entire sector.

In its various leases, Respondent agreed to provide security for its tenants. At the time the dispute at issue occurred, Respondent had guards stationed at the entrance to Raritan Center at Woodbridge Avenue and Raritan Center Parkway. The guards made a record of all trucks entering the Center by noting their license plate numbers, the names of the owners, their destination and the time of entry and exit. They also attempted to stop all other vehicles entering the Center, except when morning and evening rush hour traffic made this impossible. The guards patrolled the entire Center, including the Peddie sector. Since the events in the instant case arose, the guards have been moved back to a location near the Lehigh Valley Railroad tracks at the end of Raritan Center Parkway near the Peddie sector.

American has two buildings in the Raritan Center. One is a warehouse fronting on Raritan Center Parkway (Building 120), situated on 30 acres which American owns, and in which American conducts its hospital supply operation. American also leases a warehouse, known as Building 426, in the Peddie sector to house part of its warehouse operations for its dietary division. Building 426 is approximately one-fifth of a mile from the Peddie sector entrance.

At pertinent times, the Building 120 warehouse employees were represented by Local 807, International Brotherhood of Teamsters (the Union). The collective bargaining agreement between American and the Union covering these employees expired on March 12, 1971. On or about March 20, 1971, the employees of Building 120 struck and picketed American at Building 120. Anyone going to Building 426 had to pass Building 120 on Raritan Center Parkway. Nevertheless, about a week later, American employee Fogarty, who was also the Union's steward, and another American employee went to Building 426 in the Peddie tract and began picketing there, too.

Shortly after the picketing began on the private Peddie road in front of Building 426, Raritan Center's general superintendent, Louis Camaglia, and his

---

4. When we describe the Center and the Peddie sector, we are referring to the facts as they existed at the time of the dispute. The record indicates that by the present time the appearance of the Center, or at least the number of buildings therein, is changed.

5. One tenant in the Peddie sector, a restaurant, served all patrons, whether they were employed in the Raritan Center or not, but it did not in any way advertise as being open to the public.

6. At the time of the hearing before the Administrative Law Judge, the private road in question and other proposed roads in the Peddie tract had been offered to the local government for dedication as public roads. If this public dedication is ever accomplished, all the private roads in the Peddie sector would be eliminated and the issues involved in this case would be foreclosed from arising again in this park.

assistant, William Alagna, agents of Peddie, advised the pickets that they were on private property and that the police would be called to have them arrested if they did not leave. Thereafter Fogarty and his fellow picket left. The following morning, Fogarty and the other picket returned to Building 426 where Camaglia and Alagna again confronted them and informed them that they were on private property and they would have to leave or the police would be called to have them arrested. When they did not leave, Camaglia went back to his office, and, pursuant to instructions, called the general counsel of one of the Visceglia companies. ᐧ The general counsel said that he would handle the matter. Soon thereafter, several police officers arrived. After inquiring as to whether there were more than two pickets, one of the police officers said, "I am going to let you stay here and picket. I am going to let the courts decide this, but I want no trouble."

On March 30, 1971, Respondent filed a complaint in the Superior Court of New Jersey against the Union, alleging, *inter alia,* that the Union's entrance upon its property constituted an unprivileged invasion of its property rights. An Order to Show Cause issued on March 30, 1971, and an Order for Interlocutory Injunction issued on April 8, 1971. After a hearing, Superior Court Judge David D. Furman determined that the Union's entrance into the Peddie sector constituted a trespass, and he enjoined the conduct. The Union appealed Judge Furman's order to the Superior Court's Appellate Division, which on April 20, 1970, upheld his determination that a trespass had occurred. After the Court issued the injunction on April 8, 1971, the pickets moved to public ground at the entrance of the Peddie sector at the intersection of Raritan Center Parkway and the railroad tracks. They remained at this location until the end of the strike.

## II.

Based upon the foregoing facts, the Board found that, by threatening to cause the arrest of the employee pickets, Respondent had interfered with, coerced, and restrained the employees in the exercise of their § 7 rights and thereby violated § 8(a)(1) of the Act. As we noted at the outset, the Board reached this conclusion by applying the balancing test enunciated in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). In *Babcock,* the Court was directly concerned with the rights of non-employee organizers to distribute union literature on company-owned parking lots. Mr. Justice Reed, speaking for the Court, explained:

> Organization rights are guaranteed to workers by the same authority, the National Government that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other . . . . But when the inaccessibility of employees makes ineffective the reasonable attempts by non-employees to communicate with them through the usual channels, the right to exclude them from property has been required to yield to the extent needed to permit communication of information on the right to organize.

*Id.* at 112. The *Babcock* court went on to note that the determination of the proper adjustments rests with the Board, whose rulings should be sustained unless its conclusions rest on erroneous legal foundations or are not based on findings of fact supported by substantial evidence in the record as a whole.

■ Even though the *Babcock* facts and holding are focused on organizational picketing, the Board in the present case extended the *Babcock* balancing test to non-organizational picketing. The Board took the view that the right to picket in support of an economic strike guaranteed by § 7 is at least as important as the right of self-organization addressed in *Babcock.* According to the Board, this right to picket in support of an economic strike is embodied in § 7

and given emphasis by § 13 of the Act.[7] Section 13 explicitly reaffirms the right to strike except as specifically limited in the Act, and the Board rightly asserts that peaceful primary picketing is a legitimate activity related to the right to strike. *See, e. g.,* United Steel Workers of America, AFL–CIO v. NLRB (Carrier Corp.), 376 U.S. 492, 499, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964). At oral argument, the Board further advanced what is an impressive argument for applying *Babcock* to primary economic picketing, by asserting that Congress intended to give more protection to this § 7 right to strike than to the § 7 right to organize, as evidenced by the fact that § 8(b)(7)(C) limits organizational picketing to thirty days, while nothing in the Act so limits primary economic picketing of strikers.

In its decision, the Board viewed the picketing at Building 426 as protected activity under the Act, and concluded that such picketing did not lose its protection merely because it took place on Respondent's private property. Part of the Board's reasoning in support of its conclusion was its assertion that since the employees had a right of access to Building 426 for work purposes, they had a "parallel right of access" for purposes of otherwise legitimate picketing. In applying the *Babcock* balancing test, the Board also looked at Respondent's property rights, noting that Respondent has a property right in merely a "limited access" road which it permitted to be used by acceptable classes of persons, and that the employees from Building 120 were within that acceptable class. And the Board included in its balancing evaluation its belief that picketing at the entrance to the Peddie sector, rather than at Building 426, would have had adverse secondary effects.

Respondent, on the other hand, challenges all of the Board's arguments. First, quoting from Diamond Shamrock Co. v. NLRB, 443 F.2d 52, 58 (3d Cir. 1971), Respondent contends that it has "constitutionally protected property rights," including a right to limit access to its property. As Respondent notes, this Court denied enforcement of Board orders which were unwarranted invasions of the employer's constitutionally protected property rights. *See, e. g.,* Diamond Shamrock Co. v. NLRB, *supra,* and NLRB v. Tamiment, Inc., 451 F.2d 794 (3d Cir. 1971), cert. denied, 409 U. S. 1012, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972), where the court refused to enforce a Board order requiring the employer to allow Union organizers to solicit members on the employer's property, since the Union did not make an adequate showing that there were no reasonable alternative means for communicating directly with employees.

Respondent next argues that the pickets in the instant case were trespassers who had no right under the Act to be on the Peddie sector, since they were neither engaged in organizational activities, *cf.* NLRB v. Babcock & Wilcox Co., *supra,* nor on-duty employees exercising statutory rights. *Cf.* Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1392 (1945) (employer could not prohibit employees from soliciting fellow employees for Union when on company property and outside working time, except as necessary to maintain work discipline and production). Respondent also contends that certain language in Central Hardware Co. v. NLRB, 407 U.S. 539, 544–545, 92 S.Ct. 2238, 2242, 33 L.Ed.2d 122 (1972) confines the *Babcock* test to organizational activities. In *Central Hardware,* Justice Powell wrote:

> The principle of *Babcock* is limited to this accommodation between organization rights and property rights. This principle requires a "yielding" of property rights only in the context of an organization campaign. Moreover, the allowed intrusion on property rights is limited to that necessary to facilitate the exercise of employees' § 7 rights.

---

7. 29 U.S.C. §§ 157 and 163 (1970).

Even if a *Babcock* type of balancing test is applied, Respondent argues that its property rights outweigh the pickets' rights since the pickets had other reasonable means of communicating, by picketing at the Peddie entrance and at Building 120. Respondent further argues that the Board's balancing judgment, including its finding of adverse secondary effects, is not supported by substantial evidence in the record as a whole. It is this question of substantial evidence which is dispositve and to which we now turn.

### III.

■ We neither adopt the Board's conclusion that *Babcock* applies to economic pickets in industrial parks, nor do we accept Respondent's contentions that *Babcock* does not apply and under no circumstances can pickets parade on private industrial park property. We do not need to resolve these conflicting contentions in light of our conclusion that the Board's ruling was not supported by substantial evidence in the record as a whole, even assuming arguendo that a *Babcock* type of balancing test applies in the instant case. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It is easy to conceive of circumstances under which, if *Babcock* applied, the property rights of Respondent would have to yield to the § 7 rights of the pickets. Without detailing the myriad contexts in which that result would obtain, it would at least require a situation where there was no reasonable and safe means to communicate with employees, customers, suppliers, management, and other relevant groups, except by picketing on private property (*e. g.*, on a private road) at a primary site within an industrial park.

In the instant case there is no evidence that it was essential for the pickets to be directly in front of Building 426 in order to communicate their message effectively. The Board did not find that the picketing at the sole entrance to the Peddie tract, which was about a fifth of a mile from Building 426, was ineffective in communicating its message to the appropriate people.[8] Indeed, the record does not indicate, nor can we infer therefrom, who the appropriate persons were. The Board made no finding as to how many employees were inside Building 426, or how many customers or suppliers went to the Building. Everyone entering the Peddie tract had to pass the pickets, and those entering were forced to slow down and stop at the railroad tracks and gate; hence they should have been able to read the picket signs at that location. In fact, nothing prevented the pickets from talking to these people, although it is true that the pickets might not have known exactly which people were going to Building 426, making it harder to reach the appropriate groups as directly and persuasively. Some suppliers or other workers might have avoided being confronted by the pickets by claiming to be going elsewhere; however the Board made no such findings. While the pickets could not confront the employer at Building 426, they could still confront him at Building 120 to be sure he received their message. In addition, people going to Building 426 had to pass the pickets who were stationed at Building 120 on Raritan Center Parkway, and there is no evidence that the pickets could not communicate their message effectively from there.

In terms of the Board's assertion that since the employees had a right of access to Building 426 for work purposes, they had a "parallel right of access" for purposes of otherwise legitimate picketing, we find that the evidence to support this conclusion does not appear of record. The Board failed to explain why striking employees of Building 120 had any legal right of access to Building 426. It is not even clear what the Board

8. The Board also made no finding that the pickets were endangered at the entrance to the Peddie sector. *Cf. Logan Valley, supra* at 322 (court noted danger to pickets as a factor to consider, at least in first amendment picketing cases).

means by the phrase "right of access." The employees from Building 120 did not have any right of access to Building 426 for work purposes, since they were not employed at Building 426, nor on-duty there. *Cf.* Diamond Shamrock Co. v. NLRB, 443 F.2d 52 (3d Cir. 1971) (off-duty employees do not have same rights to solicit union support on company property as on-duty employees under *Babcock* might have in their non-working time); GTE Lenkurk, Inc., 204 NLRB No. 75, 83 LRRM 1684 (1973) (off-duty employees and non-employees considered invitees to the same extent for organizational purposes, and one is no more entitled than the other to admission to the premises for organizational purposes). While we find no substantial evidence to support the Board's conclusion that the pickets had a "right of access" for work purposes and therefore for picketing at Building 426, we accept the uncontested assumption that the pickets were engaged in legitimate primary picketing at Building 426 and would have had a right to picket there if they had been on public property. However, the Board had no substantial evidence to support its ultimate conclusion that the rights of legitimate primary pickets outweigh the property rights of the private industrial park owners under the circumstances of this case.[9]

In terms of Respondent's property rights, we find that there is not substantial evidence in the record to support the Board's evaluation of those property rights or of the injury thereto caused by permitting pickets in the Peddie sector. The Board never measured the utility to the landowner, tenants and the public of the type of realty arrangement involved here. The record indicates that Respondent had leased Building 426 to American, and had also given American an implied easement of access over the private road in the Peddie sector. As landlord, Respondent retained a reversionary interest in this property and in the easement, and it is arguable that the injury to its property was not significant, and that the trespass was only a technical trespass that in no way hurt Respondent's reversionary interest. On the other hand, if Respondent's land values would decline to a significant degree if they could not exclude pickets, that potential fact might outweigh any statutory right the pickets might have to get closer to their employer's situs. However, the Board made none of these findings of fact.

While the Board concluded that forcing the pickets to stay at the entrance to the Peddie property, instead of allowing them to go to the most proximate location directly in front of Building 426 "would have had the *statutorily undesirable result* of enmeshing other businesses which occupied space within the Peddie sector" (emphasis added), this legal conclusion was not based on factual evidence of any adverse secondary effects on the other lessees. At the time there were only 68 buildings in the Peddie sector, and all were non-retail except for one restaurant that served primarily those who worked in the other buildings. There is no evidence in the record that any of these lessees was affected at all, much less adversely, by the few pickets at the entrance to the Peddie sector.

In short, the Board did not evaluate qualitatively or quantitatively a significant number of important ingredients in the balancing test which it applied. In light of the major omissions from the record, the Board could not find as a fact supported by substantial evidence that the strikers' § 7 rights outweigh Respondent's property rights under a *Babcock* type of balancing test. As we have noted, the Board advanced no other theory in support of its decision and enforcement application. Accordingly, the Board's application for enforcement is denied.

9. American conceded in a subsequent NLRB election proceeding that the employees of Buildings 120 and 426 together constituted a single appropriate unit for collective bargaining purposes. In our view, the subsequent election is not substantial evidence of the fact that employees from Building 120 had any legal right of access to Building 426 for work purposes or for picketing on the private industrial park property.