Scott **HUDGENS**, an Individual, Petitioner-Cross-Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent-Cross-Petitioner.

No. 73–3264.

United States Court of Appeals, Fifth Circuit.

Sept. 25, 1974.

Lawrence M. Cohen, Steven R. Semler, Lederer, Fox & Grove, Jones, Bird & Howell, Chicago, Ill., Dow N. Kirkpatrick, II, Atlanta, Ga., Charles J. Reasonover, Deutsch, Kerrigan & Stiles, New Orleans, La., for petitioner.

Milton Smith, Gen. Counsel, Richard Berman, Labor Relations Counsel, Washington, D. C., Gerard C. Smetana, Jerry Kronenberg, Borovsky, Ehrlich & Kronenberg, Chicago, Ill., for Chamber of Commerce of U. S., amicus curiae.

Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate, Gen. Counsel, N. L. R. B., Washington, D. C., Walter C. Phillips, Regional Director, Sylvio Mascotti, N. L. R. B., Atlanta, Ga., Robert A. Giannasi, Vivian A. Miller, N. L. R. B., Washington, D. C., for respondent.

Before WISDOM and CLARK, Circuit Judges, and GROOMS, District Judge.

CLARK, Circuit Judge:

This case requires us to reach an accommodation under the National Labor Relations Act (NLRA) between private property rights and the right to picket in aid of a legal strike. The specific issue presented is whether a shopping center owner violated sections 7 and 8(a)(1) of the NLRA[1] by prohibiting warehouse employees of the company owning one of the center's retail store tenants from picketing the entrances to the store in aid of a strike by the warehouse employees. We affirm the finding by the National Labor Relations Board (Board) of an unfair labor practice and enforce its order.

I.

The individual petitioner, Scott Hudgens, owns North DeKalb Shopping Center, a large 60-store retail shopping center located in unincorporated surburban Atlanta, but drawing its customers from throughout the metropolitan Atlanta area. Like many modern shopping centers, this one consists of a single large building constructed around an enclosed mall. The mall provides an arcade 40 feet in width which is intersected by 30 foot wide auxiliary aisles connecting it to public entrances opening on the surrounding parking area. Although some center stores have entrances fronting only the parking lot and a few can be entered from either the mall or the parking area, most can only be entered from the mall. Eighty-five to ninety percent of the customers of these latter stores enter the building through one of the four primary entrances to the mall.

---

1. Section 7, 29 U.S.C. § 157, provides in relevant part:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . . ."

Section 8(a)(1), 29 U.S.C. § 158(a)(1), provides in part:

"It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."

A raised sidewalk encircling the building separates it from the large adjacent parking lot. There are five driveway entrances to the parking lot. Hudgens, as landlord, has a continuing interest in the commercial success of the center's tenants, since his leases with all but one of the stores are of the percentage type, i. e., rentals are calculated on a ratio of a tenant's gross sales over a guaranteed minimum rent. Additionally, Hudgens maintains a security system and exercises control and care of the common areas of the shopping center, including the mall itself and the parking lot.

In January 1971 warehouse employees of the Butler Shoe Company in Atlanta went on strike protesting the company's failure to agree to certain union demands in its contract negotiations with Local 315, Retail and Wholesale Department Store Union AFL–CIO, the bargaining representative of the warehouse employees.[2] To support this strike, the union decided to picket not only the Butler's warehouse but all of its retail stores in the Atlanta area as well.[3] Accordingly, on January 22, 1971 four warehouse employees went to North DeKalb Mall with signs reading "Butler Shoe Warehouse on Strike, AFL–CIO, Local 315" to picket the two entrances to the Butler Shoe Store, both located inside the mall. Before the store opened for the day's business, Douglas Ballard, the general manager of the shopping center, noticed the potential pickets and asked them to leave, stating that picketing was not permitted in the mall under any circumstances.[4]

The warehouse employees left, but returned within the hour and began picketing in front of the entrances to Butler's.[5] After they had picketed for about thirty minutes, Ballard informed them by telephone that he would have them arrested for trespassing, if they continued. The pickets then departed, and subsequently, the union filed an unfair labor practice charge against Hudgens with the Board.

## II.

On stipulated facts the Board interpreted Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L. Ed.2d 603 (1968);[6] to hold that a shopping center, during the times that it is open and accessible to the public, is the functional equivalent of the community business block, long associated with the exercise of First Amendment rights,[7] and

2. The employees of Butler's store in the North DeKalb Shopping Center are non-union.

3. Except for Hudgens' actions, all such picketing was without incident.

4. There is a conflict in the record as to exactly what Ballard told the pickets. At the remand hearing three of the pickets testified that Ballard told them that they would have to leave the property entirely and picket on the public streets surrounding the shopping center. An affidavit by Ballard, attached as an exhibit to the parties' stipulation, supports this testimony. Ballard testified on remand, however, that he said: "[w]e don't allow people to picket on the mall. They have to be outside on the sidewalk or either at North Druid Hills or Lawrenceville Highway on the right-of-way, one or the other . . . [y]ou just don't picket on my mall."

5. This picketing was peaceful and limited to the mall area immediately adjacent to the Butler's store entrances.

6. *Logan Valley* held that a state court injunction secured by a shopping center owner prohibiting picketing in protest to the non-union status of one of the center's stores violated the pickets' First and Fourteenth Amendment free speech rights. The Court relied heavily on Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), which had considered the streets of a company owned town as the functional equivalent of a public business district for purposes of allowing First Amendment activity and held that a shopping center was similarly the functional equivalent of a public business district at least under the facts of that case.

7. *See, e. g.*, Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

that the mere fact of ownership was not enough to "justify restrictions on the place of picketing." It then found "that *Logan Valley* establishes the union's right to picket at the location it chose, and that the Respondent's (Hudgens') threats to cause the arrest of the pickets for criminal trespass if they continued to refuse to leave the enclosed mall, unlawfully interfered with protected concerted activities, in violation of section 9(a)(1) of the Act." [8]

During the pendency here of Hudgens' petition for review of this decision, the Supreme Court decided Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) and Central Hardware Co. v. NLRB, 407 U.S. 539, 92 S. Ct. 2238, 33 L.Ed.2d 122 (1972). In *Lloyd* the Court upheld the right of the corporate owner of a large Portland, Oregon shopping mall to apply its non-discriminatory no solicitation rule to exclude anti-Viet Nam war pamphleteers from the center's interior. Finding that the constitutional inquiry must be broader than a simple in rem determination of whether a particular shopping center is the functional equivalent of a municipal business district, *Lloyd* established the appropriate initial inquiry to be whether the conduct assertedly protected by the First Amendment was "directly related in its purpose to the use to which the shopping center property [is] being put," 407 U.S. at 563, 92 S.Ct. at 2226, 33 L.Ed.2d at 140. If so, giving explicit recognition to the shopping center owner's constitutionally protected private property rights, the Court held that an accommodation between these rights and the asserted First Amendment rights required those asserting the right to use the property of another to show that reasonable alternative means of conveying their message to its intend-

ed audience are unavailable before access for this purpose will be required. Since the message in *Lloyd*, intended for the general public, had no relationship to the operation of the shopping center, and since other means of reaching such a generalized audience were readily apparent, the Court found that neither of these criteria had been met.

In *Central Hardware* the owner of two self-contained non-union retail hardware stores had prohibited non-employee union organizers from soliciting his employees in the stores' parking lots. The Board held that the "character and use" of Central's parking lots made *Logan Valley* controlling, and the Eighth Circuit affirmed. In reversing, the Court noted that *Logan Valley* rested on constitutional grounds, and was not a section 7 case. It then held that the controlling standards were those set out in NLRB v. Babcock & Wilcox Co., 351 U. S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). *Babcock & Wilcox* held that non-employee organizers seeking to solicit on an employer's private property must show, as a precondition, a lack of reasonable alternative means of reaching the employees. Furthermore, in *Central* the Court went on to note that in any event the Board had misapplied *Logan Valley*, since in order to meet the Fourteenth Amendment's threshold state action requirement, property must have assumed "to some significant degree the functional attributes of public property devoted to public use," 407 U.S. at 547, 92 S.Ct. at 2243, 33 L.Ed.2d at 128, a circumstance present in *Logan Valley* (and in *Lloyd*) but not present in the case of Central's parking lot.

In view of the relevance of *Lloyd* and *Central Hardware*, we remanded the instant case to the Board for reconsidera-

---

8. The Board's order required Hudgens to "[c]ease and desist from threatening to cause the arrest of any union members while peacefully picketing as part of protected concerted activity within the enclosed mall area of Respondent's shopping center, or in any like or related manner interfering with, restraining, or coercing employees in the ex-

ercise of their rights to self-organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection; and to refrain from any and all such activities."

tion, a hearing was held before an administrative law judge, and evidence was presented to supplement the prior stipulation. The administrative law judge read *Central Hardware, supra,* to require him to apply the *Babcock & Wilcox Co.* test, but he found that since "the union had no other reasonable access to Butler's customers coming to the DeKalb shopping center," its requirements had been met. The Board affirmed the administrative law judge's decision for the reasons it had previously set out in Frank Visceglia and Vincent Visceglia, d/b/a Peddie Buildings, 203 NLRB No. 27, enforcement denied, N.L.R.B. v. Visceglia, 498 F.2d 43 (3d Cir. 1974).[9] Its rationale was that Butler's warehouse employees were within the scope of Hudgens' invitation to the public to come to the shopping center to do business with its tenants; "[t]hat being the case, Butler's employees could not be designated as unacceptable and excluded from the mall solely because they chose to engage in protected concerted activity." Furthermore, the Board was of the view that picketing directly in front of Butler's store would avoid the possible secondary effects attending picketing at a more distant location, which might "well be a common situs for entrance to other places of business."

### III.

◼ Changing horses in midstream, the Board argues on appeal that this case is controlled by Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). *Republic Aviation* approved the Board's *Peyton Packing Co.* presumption, 49 NLRB 828 (1943), enforced, 142 F.2d 1009 (5th Cir.), cert. denied, 323 U.S. 730, 65 S.Ct.

66, 89 L.Ed. 585 (1944); which held it to be an unfair labor practice for an employee to enforce a no solicitation rule against employee organizers unless it could be proven that such a rule was necessitated by special circumstances, *i. e.,* to maintain production or discipline. The availability of alternative means for the employee organizers to communicate with the other employees is not relevant to this inquiry.[10] Therefore, the Board reasons that since Hudgens offered no proof the picketing interfered with the normal functioning of the shopping center, the pickets could not be excluded.

Hudgens' main appellate argument is that *Central Hardware* requires this case be adjudicated by the standards of *Babcock & Wilcox.* He contends that the Board's General Counsel failed to carry his burden of proving there were no "other available channels of communication" which would have enabled the union to reach its intended audience with its message, *see, e. g.,* Diamond Shamrock Co. v. NLRB, *supra,* n. 10; McDonald Douglas Corp. v. NLRB, 472 F.2d 539 (8th Cir. 1973); and NLRB v. Tamiment, Inc., 451 F.2d 794 (3d Cir. 1971). Additionally, Hudgens argues that his evidence established that "[t]he union in this case manifestly had countless, varied means of communication, in addition to the picketing here at issue, available to reach its desired audience," including picketing at the four entrances to the enclosed mall, in the parking lot, and on the public thoroughfares near the shopping center; advertising by newspaper, radio and television; and use of other media, such as direct mail, handbills, and billboards to reach potential Butler's customers.

Proper resolution of the instant case cannot be reached through a per se ap-

---

9. *Peddie Buildings* involved picketing on private property at the entrance to an industrial park in which was located a plant owned by the company that was the subject of the picketing.

10. This is the rule in this circuit, *see* Republic Aluminum Co. v. NLRB, 394 F.2d 405 (5 Cir. 1968) (en banc), and apparently the

majority rule, *see* Diamond Shamrock Company v. NLRB, 443 F.2d 52, n. 27 (3d Cir. 1971). The Third Circuit however, requires that the Board consider whether alternative means of communication are available before invalidating an employee no solicitation rule. *See* NLRB v. Rockwell Mfg. Co., 271 F.2d 109 (1959).

plication of either *Republic Aviation* relied upon by the Board, or *Babcock & Wilcox* relied upon by Hudgens. Both of those cases balanced conflicting interest to reach an accommodation.[11] There is no question that employees have the abstract right to picket their employer wherever he is located, *see* NLRB v. Local 810, Sheet Metals, etc., 460 F.2d 1 (2d Cir. 1972); and Local 761, Electrical Workers v. NLRB, 366 U.S. 667, 672, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592, 596 (1961). However, equally valid are Hudgens' property rights. The requisite solution of this case requires a balancing of the two, but because the interests are significantly different neither formula urged by the parties exactly fits. The Board's position is farthest afield. It takes a very broad view of who is to be considered an employee of Butler's within the rule of *Republic Aviation,* then uses the result as a basis for impinging upon the property rights of Hudgens, who clearly is not their employer in even the broadest sense. Such a misapplication of *Republic* is particularly inappropriate, because there the employee organizers "were lawfully and properly on the employer's premises pursuant to the work relationship;" hence no employer interests existed which are comparable to the private property rights of Hudgens in the instant case.[12] Furthermore, any decision in this case which ignored or failed to weigh Hudgens' property rights would disregard the emphasis in *Lloyd* and *Central Hardware* on the need for protection of such rights.

Hudgens' insistence that we are bound to apply the test of *Babcock & Wilcox* is not technically correct. There, the property rights were those of the employer, not a third party; and the labor rights involved were organizational rights, not consumer picketing rights. Indeed in both *Babcock & Wilcox* and *Central Hardware* the court carefully limited its consideration to organizational cases. Although the consideration of alternatives required by *Babcock & Wilcox* is relevant to proper resolution of today's case, it is not the complete answer in consumer picketing cases.

### IV.

Recognizing that the rules urged upon us by both Hudgens and the Board do not address themselves to the kind of variables present in the instant case, the United States Chamber of Commerce as amicus curiae has suggested a different tack. It urges that we should apply a test it derives by blending *Lloyd* and *Logan Valley, i. e.,* "private property becomes subject to protest or propaganda activity when both of the following are satisfied: (a) the protest is related to the use to which the property is put and (b) there exists no reasonably effective alternative means of communication to reach the intended audience." Amicus' argument that criterion (b) has not

---

11. *Republic Aviation* placed in the scales the relevant labor-property interests where an employer had banned all solicitation of fellow employees by union adherents already in his employ. *Babcock & Wilcox* balanced organizational rights asserted by non-employees against an employer's property rights. In this latter case, the Court said:

"Accommodation between [organization rights and property rights] must be obtained with as little destruction of one as is consistent with the maintenance of the other. The employer may not affirmatively interfere with organizations; the union may not always insist that the employer aid organization. But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize."

351 U.S. at 112, 76 S.Ct. at 684, 100 L.Ed. at 982.

12. The controlling significance of this difference in rights was recognized in Diamond Shamrock Co. v. NLRB, *supra,* a case which applied the non-employee standards of *Babcock & Wilcox* rather than the employee standards of *Republic Aviation* to organizational solicitation by off-duty employees. *See also*, GPE Lenkurt, Inc., 204 NLRB No. 74 (1973), and NLRB v. Great Atlantic & Pacific Tea Co., 277 F.2d 759 (5th Cir. 1960).

been satisfied tracks Hudgens' arguments as to failure to satisfy *Babcock & Wilcox*. It further argues that criterion (a) was not satisfied either because the direct relationship test here would require that the picketing involve a shopping center store in the sense that "the adverse effects of the dispute must directly jeopardize the employees working at that site (the store tenant)."[13]

■ Section 7 rights are not necessarily coextensive with constitutional rights, *see* Central Hardware v. NLRB, *supra* (Brennan, J., dissenting). Nevertheless, we agree that the rule suggested by amicus, although having its genesis in the constitutional issues raised in *Lloyd,* isolates the factors relevant to determining when private property rights of a shopping center owner should be required to yield to the section 7 rights of labor picketers. The first consideration —the relationship between the picketing and shopping center operations—is relevant to determining whether the pickets have any right at all to conduct consumer-employer picketing inside a private enclosed mall, while the second consideration assays these picket rights against the conflicting property rights of the center owner. However, we do not apply these dual considerations in the same manner as amicus, nor do we reach the same result.

A. *Relationship Between the Picketing and Normal Functions of the Shopping Center*

■ The objects of the picketing were those employed by and those who might patronize the Butler store in the North DeKalb Mall, and the message concerned the fact that warehouse employees of Butler's were on strike. Potential customers of Butler's North DeKalb store comprised a group within the scope of the broad invitation issued by Hudgens to the public to come and shop at center stores. The picketers' message to withhold patronage from the Butler store was directly related to Hudgens' invitation, although not specifically related to the operation of the particular Butler store in the North DeKalb Mall. The appropriate focus is on the message sought to be conveyed and its intended audience, not, as the amicus urges, on whether the labor dispute in fact was precipitated by something involving the operation of one particular store in the shopping center. The Court's opinion in *Lloyd* reflects the need to focus on the scope of the invitation extended to the public. *See* 407 U.S. at 556–566, 92 S.Ct. at 2226–2227, 33 L.Ed.2d at 135. Indeed, the issue in that case distinctly included the extent of dedication to public use and not simply the degree of relationship between the actual operation of the shopping center and the picketing. Neither logic nor precedent requires that picketing be directly related to the actual operation of an individual store in the shopping center as was the case in *Logan Valley.* Although the facts in *Lloyd* were different—the anti-Viet Nam War handbilling here had "no relation to any purpose for which the center was built and being used," 407 U.S. at 564, 92 S.Ct. at 2226, 33 L.Ed.2d at 140—the rationale is fully applicable here.

■ Additionally, acceptance of the strict relationship requirement urged upon us by amicus would mean that "businesses situated in the suburbs could largely immunize themselves from . . . criticism [in many circumstances] by creating a cordon sanitaire of parking lots around their stores."

---

13. Amicus argues that the picketing must be at least as directly related to the business of the shopping center as the picketing was in *Logan Valley.* For this proposition amicus relies on Mr. Justice Marshall's caveat in footnote 9 of *Logan Valley:*

"[w]e are, therefore, not called upon to consider whether respondents' property rights could, consistently with the First Amendment, justify a bar on picketing which was not *thus* directly related in its purpose to the use to which the shopping center was being put." [Italics ours]

391 U.S. at 320, 88 S.Ct. at 1609; 20 L.Ed.2d at 613 (1968) ; and Mr. Justice Douglas's concurring opinion in *Logan Valley.*

Logan Valley, *supra,* 391 U.S. at 325, 88 S.Ct. at 1612, 20 L.Ed.2d at 615, cited with approval in *Lloyd,* 407 U.S. at 562, 92 S.Ct. at 2225, 33 L.Ed.2d at 139. If we were to adopt such a narrow view, a chain which had all its retail outlets located in enclosed shopping centers could prevent direct picket contact with its customers at all stores whenever the dispute was by workers in any non-retail division. Then too, if the dispute related to the operation of one particular store, only that store could be picketed. The result would be to confer upon an employer an ability to limit the effectiveness of publicizing labor disputes by insulating its trade inside shopping centers. Even where the union could prove the inadequacy of alternative means of reaching the customers of a store, effective picketing would be cut off. The end result would be that employees' protected right to picket their employer wherever he is located, *see* NLRB v. Local 810, Sheet Metals, Etc., *supra*; and Local 761, Electrical Workers v. NLRB, *supra,* would be nullified.

In short, we find the picketing in the instant case was sufficiently related to the business of the North DeKalb Shopping Center to meet the requirements of the relationship test enunciated in *Lloyd.*

### B. *Alternative Channels of Communication*

What alternatives to picketing in the mall existed?

It is crucial for any analysis to recognize from its outset that the intended audience of the picketing in the instant case included not only the employees of Butler's at the North DeKalb Shopping Center but also the potential customers of Butler's North DeKalb store. This latter audience was only identifiable as part of the citizenry of greater Atlanta until it approached the store, and thus for the picketing to be effective, the location chosen was crucial unless the audience could be known and reached by other means.

This contrasts with organizational campaigns in which the audience solicited is composed of employees of a particular employer, a limited usually identifiable group, which often can be reached very effectively by means other than personal contact on the employer's private property. Indeed, in what is perhaps an implicit recognition of the judicial belief that this sort of conduct can take place anywhere, courts have rarely found that the general counsel met the burden of proving a lack of adequate alternatives to solicitation on an employer's property. *See* NLRB v. Solo Cup Co., 422 F.2d 1149, 1151 (7th Cir. 1970), quoting from Broomfield, Preemptive Federal Jurisdiction over Concerted Trespassory Union Activity, 83 Harv. L.Rev. 552 (1970), and *compare* NLRB v. S & H Grossinger's, Inc., 372 F.2d 26 (2d Cir. 1967), *with* NLRB v. Kutsher's Hotel and Country Club, 427 F.2d 200 (2d Cir. 1970), and NLRB v. Tamiment, 451 F.2d 794 (3d Cir. 1971). Thus, the quantum and type of proof which *Babcock & Wilcox* and its progeny involving organizational rights require on the issue of alternative avenues of communication is not necessarily relevant here.

Hudgens certainly takes an over-broad position in urging that the General Counsel was required to establish that television and radio advertising, direct mailing, and other advertising devices directed at the geographical area from which the Butler's store at North DeKalb Shopping Center draws its customers would be unavailing. Such alternatives might be part of the General Counsel's burden in a particular organizational situation, *cf*. The Falk Corp., 192 NLRB 716 (1971), *but see* NLRB v. United Aircraft, 324 F.2d 128, 130 (2d Cir. 1963). However as substitutes for consumer picketing in a case involving an audience not readily identifiable, and requiring saturation coverage of a large, populous geographical area, such a burden is patently inappropriate. Hudgens' testimony as to the low unit cost and the effectiveness of these advertising methods does not demonstrate that they con-

stituted an acceptable substitute for picketing. That they were useful and utilized by the shopping center to attract customers from the general public does not establish that they were viable alternatives for taking the pickets' message to Butler customers and employees.

Indeed, even in *Lloyd* the Court did not consider this type of alternative, although the audience that the *Lloyd* handbillers sought to reach, the public in general, might seem to lend itself to almost any kind of approach. It must also be noted that all of the Butler stores in the Atlanta area were being picketed at the time the instant dispute arose. Since North DeKalb Shopping Center draws its customers from the entire Atlanta area, it would be totally unreasonable to require the union to advertise through the entire Atlanta area to reach the potential customers of this one remaining store. An accommodation which required such a procedure would unjustifiably denigrate section 7 rights.

*Lloyd* burdens the General Counsel with the duty to prove that other locations less intrusive upon Hudgens' property rights than picketing inside the mall were either unavailable or ineffective. However, as previously noted, the realities of the situation establish that part of the audience the pickets sought to reach was not identifiable, other than as citizens of metropolitan Atlanta, until it approached the store. By the nature of the use to which the property was put and because of the advertised invitations of Hudgens and Butler's to shop at North DeKalb's stores, a location at or near the mall was essential to any kind of reasonably effective communication. The alternatives of picketing at the mall entrances or on the parking lots were not available to the union. Confronted with this conflicting testimony on this issue, the administrative law judge found as a fact that Ballard (the shopping center manager) told the pickets that they would have to remove themselves to the public thoroughfares. We accept this finding. *See* Great Atlantic & Pacific Tea Co. v. NLRB, 354 F.2d 707, 709 (5th Cir. 1966); NLRB v. Universal Packing & Gasket Co., 379 F.2d 269, 270 (5th Cir. 1967); and NLRB v. Longhorn Transfer Service, Inc., 346 F. 2d 1003 (5th Cir. 1965). Nor was picketing on the public streets adjacent to the shopping center an acceptable alternative. The closest such location for picketing was approximately 500 ft. from the mall. The problems with this type of picketing were recounted in part by the Court in *Logan Valley*: (1) difficulty in reading picket signs, (2) traffic danger to pickets and (3) difficulty and hazard in handing out handbills. *See* 391 U.S. at 321–322, 88 S.Ct. at 1610, 20 L.Ed.2d at 613. Additionally, the farther the message is removed from the point at which action is to be taken the greater the potential for dilution or total loss of effect. Of course this is a matter of degree. Clearly, a union does not have an absolute right to picket at every point of optimum effect regardless of its result upon other competing interests. Nevertheless, the potential for dilution is relevant to a consideration of adequate alternatives. Finally, picketing at the entrances to the shopping center parking lot or on the streets leading into the parking lot would render it difficult for the union to limit the effect of its picketing to Butler's only. *See* Logan Valley, supra, 391 U.S. at 323, 88 S.Ct. 1611, 20 L.Ed.2d 614.[14] Therefore, we hold that alternatives to picketing inside the mall were either unavailable or inadequate.

The petition for review is denied and the Board's order is

Enforced.

14. *Peddie Buildings, supra,* relied upon heavily by Hudgens, even if binding upon us would not compel us to reach a different result, the picketing in the instant case being clearly distinguishable from that in *Peddie Buildings*.