# HUDGENS *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 74–773.   Argued October 14, 1975—Decided March 3, 1976

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined.

POWELL, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 523. WHITE, J., filed an opinion concurring in the result, *post*, p. 524. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 525. STEVENS, J., took no part in the consideration or decision of the case.

*Lawrence M. Cohen* argued the cause for petitioner. With him on the brief were *Steven R. Semler* and *Dow N. Kirkpatrick, II.*

*Norton J. Come* argued the cause for respondent National Labor Relations Board. With him on the brief were *Solicitor General Bork, William L. Patton, Peter G. Nash, John S. Irving, Patrick Hardin,* and *Robert A. Giannasi. Laurence Gold* argued the cause for respondent Local 315, Retail & Wholesale Department Store Union, AFL–CIO. With him on the brief were *Morgan Stanford* and *J. Albert Woll.**

MR. JUSTICE STEWART delivered the opinion of the Court.

A group of labor union members who engaged in peaceful primary picketing within the confines of a privately owned shopping center were threatened by an agent of the owner with arrest for criminal trespass if they did not depart. The question presented is whether this threat violated the National Labor Relations Act, 49 Stat. 449, as amended, 61 Stat. 136, 29 U. S. C. § 151 *et seq.* The National Labor Relations Board concluded that it did, 205 N. L. R. B. 628, and the Court of Appeals for the Fifth Circuit agreed. 501 F. 2d 161. We granted certiorari because of the seemingly important questions of federal law presented. 420 U. S. 971.

---

*\*Milton A. Smith, Richard B. Berman, Gerard C. Smetana,* and *Jerry Kronenberg* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

I

The petitioner, Scott Hudgens, is the owner of the North DeKalb Shopping Center, located in suburban Atlanta, Ga. The center consists of a single large building with an enclosed mall. Surrounding the building is a parking area which can accommodate 2,640 automobiles. The shopping center houses 60 retail stores leased to various businesses. One of the lessees is the Butler Shoe Co. Most of the stores, including Butler's, can be entered only from the interior mall.

In January 1971, warehouse employees of the Butler Shoe Co. went on strike to protest the company's failure to agree to demands made by their union in contract negotiations.[1] The strikers decided to picket not only Butler's warehouse but its nine retail stores in the Atlanta area as well, including the store in the North DeKalb Shopping Center. On January 22, 1971, four of the striking warehouse employees entered the center's enclosed mall carrying placards which read: "Butler Shoe Warehouse on Strike, AFL–CIO, Local 315." The general manager of the shopping center informed the employees that they could not picket within the mall or on the parking lot and threatened them with arrest if they did not leave. The employees departed but returned a short time later and began picketing in an area of the mall immediately adjacent to the entrances of the Butler store. After the picketing had continued for approximately 30 minutes, the shopping center manager again informed the pickets that if they did not leave they would be arrested for trespassing. The pickets departed.

The union subsequently filed with the Board an unfair labor practice charge against Hudgens, alleging interference with rights protected by § 7 of the Act, 29

---

[1] The Butler warehouse was not located within the North DeKalb Shopping Center.

U. S. C. § 157.[2]  Relying on this Court's decision in
*Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308, the
Board entered a cease-and-desist order against Hudgens,
reasoning that because the warehouse employees enjoyed
a First Amendment right to picket on the shopping center
property, the owner's threat of arrest violated § 8 (a)(1)
of the Act, 29 U. S. C. § 158 (a)(1).[3]  Hudgens filed a
petition for review in the Court of Appeals for the Fifth
Circuit.  Soon thereafter this Court decided *Lloyd Corp.*
v. *Tanner,* 407 U. S. 551, and *Central Hardware Co.* v.
*NLRB,* 407 U. S. 539, and the Court of Appeals remanded
the case to the Board for reconsideration in light of those
two decisions.

The Board, in turn, remanded to an Administrative
Law Judge, who made findings of fact, recommendations,
and conclusions to the effect that Hudgens had commit-
ted an unfair labor practice by excluding the pickets.

---

[2] Section 7, 29 U. S. C. § 157, provides:

"Employees shall have the right to self-organization, to form,
join, or assist labor organizations, to bargain collectively through
representatives of their own choosing, and to engage in other con-
certed activities for the purpose of collective bargaining or other
mutual aid or protection, and shall also have the right to refrain
from any or all of such activities except to the extent that such
right may be affected by an agreement requiring membership in a
labor organization as a condition of employment as authorized in
section 158 (a)(3) of this title."

[3] *Hudgens* v. *Local 315, Retail, Wholesale & Dept. Store Union,*
192 N. L. R. B. 671.  Section 8 (a)(1) makes it an unfair labor
practice for "an employer" to "restrain, or coerce employees" in the
exercise of their § 7 rights.  While Hudgens was not the employer
of the employees involved in this case, it seems to be undisputed that
he was an employer engaged in commerce within the meaning of §§ 2
(6) and (7) of the Act, 29 U. S. C. §§ 152 (6) and (7).  The Board
has held that a statutory "employer" may violate § 8 (a)(1) with
respect to employees other than his own.  See *Austin Co.,* 101
N. L. R. B. 1257, 1258–1259.  See also § 2 (13) of the Act, 29
U. S. C. § 152 (13).

This result was ostensibly reached under the statutory criteria set forth in *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105, a case which held that union organizers who seek to solicit for union membership may intrude on an employer's private property if no alternative means exist for communicating with the employees. But the Administrative Law Judge's opinion also relied on this Court's constitutional decision in *Logan Valley* for a "realistic view of the facts." The Board agreed with the findings and recommendations of the Administrative Law Judge, but departed somewhat from his reasoning. It concluded that the pickets were within the scope of Hudgens' invitation to members of the public to do business at the shopping center, and that it was, therefore, immaterial whether or not there existed an alternative means of communicating with the customers and employees of the Butler store.[4]

Hudgens again petitioned for review in the Court of Appeals for the Fifth Circuit, and there the Board changed its tack and urged that the case was controlled not by *Babcock & Wilcox,* but by *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793, a case which held that an employer commits an unfair labor practice if he enforces a no-solicitation rule against employees on his premises who are also union organizers, unless he can prove that the rule is necessitated by special circumstances. The Court of Appeals enforced the Board's cease-and-desist order but on the basis of yet another theory. While acknowledging that the source of the pickets' rights was § 7 of the Act, the Court of Appeals held that the competing constitutional and property right considerations discussed in *Lloyd Corp.* v. *Tanner, supra,* "burde[n] the General Counsel with the duty to

---

[4] *Hudgens* v. *Local 315, Retail, Wholesale & Dept. Store Union,* 205 N. L. R. B. 628.

prove that other locations less intrusive upon Hudgens' property rights than picketing inside the mall were either unavailable or ineffective," 501 F. 2d, at 169, and that the Board's General Counsel had met that burden in this case.

In this Court the petitioner Hudgens continues to urge that *Babcock & Wilcox Co.* is the controlling precedent, and that under the criteria of that case the judgment of the Court of Appeals should be reversed. The respondent union agrees that a statutory standard governs, but insists that, since the § 7 activity here was not organizational as in *Babcock* but picketing in support of a lawful economic strike, an appropriate accommodation of the competing interests must lead to an affirmance of the Court of Appeals' judgment. The respondent Board now contends that the conflict between employee picketing rights and employer property rights in a case like this must be measured in accord with the commands of the First Amendment, pursuant to the Board's asserted understanding of *Lloyd Corp.* v. *Tanner, supra,* and that the judgment of the Court of Appeals should be affirmed on the basis of that standard.

## II

As the above recital discloses, the history of this litigation has been a history of shifting positions on the part of the litigants, the Board, and the Court of Appeals. It has been a history, in short, of considerable confusion, engendered at least in part by decisions of this Court that intervened during the course of the litigation. In the present posture of the case the most basic question is whether the respective rights and liabilities of the parties are to be decided under the criteria of the National Labor Relations Act alone, under a First Amendment standard, or under some combination of the two. It is to that question, accordingly, that we now turn.

It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state. See *Columbia Broadcasting System, Inc.* v. *Democratic National Comm.*, 412 U. S. 94. Thus, while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself.

This elementary proposition is little more than a truism. But even truisms are not always unexceptionably true, and an exception to this one was recognized almost 30 years ago in *Marsh* v. *Alabama,* 326 U. S. 501. In *Marsh,* a Jehovah's Witness who had distributed literature without a license on a sidewalk in Chickasaw, Ala., was convicted of criminal trespass. Chickasaw was a so-called company town, wholly owned by the Gulf Shipbuilding Corp. It was described in the Court's opinion as follows:

> "Except for [ownership by a private corporation] it has all the characteristics of any other American town. The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated. A deputy of the Mobile County Sheriff, paid by the company, serves as the town's policeman. Merchants and service establishments have rented the stores and business places on the business block and the United States uses one of the places as a post office from which six carriers deliver mail to the people of Chickasaw and the adjacent area. The town and the surrounding neighborhood, which can not be distinguished from the Gulf property by anyone not familiar with the property lines, are thickly

settled, and according to all indications the residents use the business block as their regular shopping center. To do so, they now, as they have for many years, make use of a company-owned paved street and sidewalk located alongside the store fronts in order to enter and leave the stores and the post office. Intersecting company-owned roads at each end of the business block lead into a four-lane public highway which runs parallel to the business block at a distance of thirty feet. There is nothing to stop highway traffic from coming onto the business block and upon arrival a traveler may make free use of the facilities available there. In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation." *Id.*, at 502–503.

The Court pointed out that if the "title" to Chickasaw had "belonged not to a private but to a municipal corporation and had appellant been arrested for violating a municipal ordinance rather than a ruling by those appointed by the corporation to manage a company town it would have been clear that appellant's conviction must be reversed." *Id.*, at 504. Concluding that Gulf's "property interests" should not be allowed to lead to a different result in Chickasaw, which did "not function differently from any other town," *id.*, at 506–508, the Court invoked the First and Fourteenth Amendments to reverse the appellant's conviction.

It was the *Marsh* case that in 1968 provided the foundation for the Court's decision in *Amalgamated Food Employees Union* v. *Logan Valley Plaza*, 391 U. S. 308. That case involved peaceful picketing within a large

shopping center near Altoona, Pa. One of the tenants of the shopping center was a retail store that employed a wholly nonunion staff. Members of a local union picketed the store, carrying signs proclaiming that it was nonunion and that its employees were not receiving union wages or other union benefits. The picketing took place on the shopping center's property in the immediate vicinity of the store. A Pennsylvania court issued an injunction that required all picketing to be confined to public areas outside the shopping center, and the Supreme Court of Pennsylvania affirmed the issuance of this injunction. This Court held that the doctrine of the *Marsh* case required reversal of that judgment.

The Court's opinion pointed out that the First and Fourteenth Amendments would clearly have protected the picketing if it had taken place on a public sidewalk:

> "It is clear that if the shopping center premises were not privately owned but instead constituted the business area of a municipality, which they to a large extent resemble, petitioners could not be barred from exercising their First Amendment rights there on the sole ground that title to the property was in the municipality. *Lovell* v. *Griffin,* 303 U. S. 444 (1938); *Hague* v. *CIO,* 307 U. S. 496 (1939); *Schneider* v. *State,* 308 U. S. 147 (1939); *Jamison* v. *Texas,* 318 U. S. 413 (1943). The essence of those opinions is that streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." 391 U. S., at 315.

The Court's opinion then reviewed the *Marsh* case in detail, emphasized the similarities between the business

block in Chickasaw, Ala., and the Logan Valley shopping center, and unambiguously concluded:

> "The shopping center here is clearly the functional equivalent of the business district of Chickasaw involved in *Marsh*." 391 U. S., at 318.

Upon the basis of that conclusion, the Court held that the First and Fourteenth Amendments required reversal of the judgment of the Pennsylvania Supreme Court.

There were three dissenting opinions in the *Logan Valley* case, one of them by the author of the Court's opinion in *Marsh*, Mr. Justice Black. His disagreement with the Court's reasoning was total:

> "In affirming petitioners' contentions the majority opinion relies on *Marsh* v. *Alabama, supra,* and holds that respondents' property has been transformed to some type of public property. But *Marsh* was never intended to apply to this kind of situation. *Marsh* dealt with the very special situation of a company-owned town, complete with streets, alleys, sewers, stores, residences, and everything else that goes to make a town. . . . I can find very little resemblance between the shopping center involved in this case and Chickasaw, Alabama. There are no homes, there is no sewage disposal plant, there is not even a post office on this private property which the Court now considers the equivalent of a 'town.'" 391 U. S., at 330–331 (footnote omitted).

> "The question is, Under what circumstances can private property be treated as though it were public? The answer that *Marsh* gives is when that property has taken on *all* the attributes of a town, *i. e.,* 'residential buildings, streets, a system of sewers, a sewage disposal plant and a "business block" on which business places are situated.' 326 U. S., at 502. I

can find nothing in *Marsh* which indicates that if one of these features is present, *e. g.,* a business district, this is sufficient for the Court to confiscate a part of an owner's private property and give its use to people who want to picket on it." *Id.,* at 332.

"To hold that store owners are compelled by law to supply picketing areas for pickets to drive store customers away is to create a court-made law wholly disregarding the constitutional basis on which private ownership of property rests in this country. . . ." *Id.,* at 332–333.

Four years later the Court had occasion to reconsider the *Logan Valley* doctrine in *Lloyd Corp.* v. *Tanner,* 407 U. S. 551. That case involved a shopping center covering some 50 acres in downtown Portland, Ore. On a November day in 1968 five young people entered the mall of the shopping center and distributed handbills protesting the then ongoing American military operations in Vietnam. Security guards told them to leave, and they did so, "to avoid arrest." *Id.,* at 556. They subsequently brought suit in a Federal District Court, seeking declaratory and injunctive relief. The trial court ruled in their favor, holding that the distribution of handbills on the shopping center's property was protected by the First and Fourteenth Amendments. The Court of Appeals for the Ninth Circuit affirmed the judgment, 446 F. 2d 545, expressly relying on this Court's *Marsh* and *Logan Valley* decisions. This Court reversed the judgment of the Court of Appeals.

The Court in its *Lloyd* opinion did not say that it was overruling the *Logan Valley* decision. Indeed, a substantial portion of the Court's opinion in *Lloyd* was devoted to pointing out the differences between the two cases, noting particularly that, in contrast to the handbilling in *Lloyd,* the picketing in *Logan Valley* had been

specifically directed to a store in the shopping center and the pickets had had no other reasonable opportunity to reach their intended audience. 407 U. S., at 561–567.[5] But the fact is that the reasoning of the Court's opinion in *Lloyd* cannot be squared with the reasoning of the Court's opinion in *Logan Valley.*

It matters not that some Members of the Court may continue to believe that the *Logan Valley* case was rightly decided.[6] Our institutional duty is to follow until changed the law as it now is, not as some Members of the Court might wish it to be. And in the performance of that duty we make clear now, if it was not clear before, that the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case.[7] Not only did the *Lloyd* opinion incorporate lengthy excerpts from two of the dissenting opinions in *Logan Valley,* 407 U. S., at 562–563, 565; the ultimate holding in *Lloyd* amounted to a total rejection of the holding in *Logan Valley:*

> "The basic issue in this case is whether respondents, in the exercise of asserted First Amendment

---

[5] Insofar as the two shopping centers differed as such, the one in *Lloyd* more closely resembled the business section in Chickasaw, Ala.:

"The principal differences between the two centers are that the Lloyd Center is larger than Logan Valley, that Lloyd Center contains more commercial facilities, that Lloyd Center contains a range of professional and nonprofessional services that were not found in Logan Valley, and that Lloyd Center is much more intertwined with public streets than Logan Valley. Also, as in *Marsh, supra,* Lloyd's private police are given full police power by the city of Portland, even though they are hired, fired, controlled, and paid by the owners of the Center. This was not true in *Logan Valley.*" 407 U. S., at 575 (MARSHALL, J., dissenting).

[6] See *id.,* at 570 (MARSHALL, J., dissenting).

[7] This was the entire thrust of MR. JUSTICE MARSHALL's dissenting opinion in the *Lloyd* case. See *id.,* at 584.

rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against *all* handbilling. In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminatorily for private purposes only. . . ." 407 U. S., at 567.

"Respondents contend . . . that the property of a large shopping center is 'open to the public,' serves the same purposes as a 'business district' of a municipality, and therefore has been dedicated to certain types of public use. The argument is that such a center has sidewalks, streets, and parking areas which are functionally similar to facilities customarily provided by municipalities. It is then asserted that all members of the public, whether invited as customers or not, have the same right of free speech as they would have on the similar public facilities in the streets of a city or town.

"The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh* v. *Alabama,* *supra,* involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semiofficial municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case there is no comparable assumption or exercise of municipal functions or power." *Id.,* at 568–569 (footnote omitted).

"We hold that there has been no such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights. . . ." *Id.*, at 570.

If a large self-contained shopping center *is* the functional equivalent of a municipality, as *Logan Valley* held, then the First and Fourteenth Amendments would not permit control of speech within such a center to depend upon the speech's content.[8] For while a municipality may constitutionally impose reasonable time, place, and manner regulations on the use of its streets and sidewalks for First Amendment purposes, see *Cox* v. *New Hampshire,* 312 U. S. 569; *Poulos* v. *New Hampshire,* 345 U. S. 395, and may even forbid altogether such use of some of its facilities, see *Adderley* v. *Florida,* 385 U. S. 39; what a municipality may *not* do under the First and Fourteenth Amendments is to discriminate in the regulation of expression on the basis of the content of that expression, *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95.[9] It conversely follows, therefore, that if the respondents in the *Lloyd* case did not have a First Amendment right to enter that shopping center to distribute handbills concerning Vietnam, then the pickets in the present case did not have a First Amendment

---

[8] Mr. Justice White clearly recognized this principle in his *Logan Valley* dissenting opinion. 391 U. S., at 339.

[9] The Court has in the past held that some expression is not protected "speech" within the meaning of the First Amendment. *Roth* v. *United States,* 354 U. S. 476; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568.

right to enter this shopping center for the purpose of advertising their strike against the Butler Shoe Co.

We conclude, in short, that under the present state of the law the constitutional guarantee of free expression has no part to play in a case such as this.

## III

From what has been said it follows that the rights and liabilities of the parties in this case are dependent exclusively upon the National Labor Relations Act. Under the Act the task of the Board, subject to review by the courts, is to resolve conflicts between § 7 rights and private property rights, "and to seek a proper accommodation between the two." *Central Hardware Co.* v. *NLRB,* 407 U. S., at 543. What is "a proper accommodation" in any situation may largely depend upon the content and the context of the § 7 rights being asserted. The task of the Board and the reviewing courts under the Act, therefore, stands in conspicuous contrast to the duty of a court in applying the standards of the First Amendment, which requires "above all else" that expression must not be restricted by government "because of its message, its ideas, its subject matter, or its content."

In the *Central Hardware* case, and earlier in the case of *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105, the Court considered the nature of the Board's task in this area under the Act. Accommodation between employees' § 7 rights and employers' property rights, the Court said in *Babcock & Wilcox,* "must be obtained with as little destruction of one as is consistent with the maintenance of the other." 351 U. S., at 112.

Both *Central Hardware* and *Babcock & Wilcox* involved organizational activity carried on by nonemployees on the employers' property.[10] The context of the § 7

---

[10] A wholly different balance was struck when the organizational

activity in the present case was different in several respects which may or may not be relevant in striking the proper balance. First, it involved lawful economic strike activity rather than organizational activity. See *Steelworkers* v. *NLRB*, 376 U. S. 492, 499; *Bus Employees* v. *Missouri*, 374 U. S. 74, 82; *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 234. Cf. *Houston Insulation Contractors Assn.* v. *NLRB*, 386 U. S. 664, 668–669. Second, the § 7 activity here was carried on by Butler's employees (albeit not employees of its shopping center store), not by outsiders. See *NLRB* v. *Babcock & Wilcox Co., supra,* at 111–113. Third, the property interests impinged upon in this case were not those of the employer against whom the § 7 activity was directed, but of another.[11]

The *Babcock & Wilcox* opinion established the basic objective under the Act: accommodation of § 7 rights and private property rights "with as little destruction of one as is consistent with the maintenance of the other."[12] The locus of that accommodation, however, may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context. In each generic situation, the primary responsibility for making this accommodation must rest with the Board in the first instance. See *NLRB* v. *Babcock & Wilcox, supra,* at 112; cf. *NLRB* v. *Erie Resistor Corp., supra,* at 235–

---

activity was carried on by employees already rightfully on the employer's property, since the employer's management interests rather than his property interests were there involved. *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793. This difference is "one of substance." *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S., at 113.

[11] This is not to say that Hudgens was not a statutory "employer" under the Act. See n. 3, *supra.*

[12] 351 U. S., at 112. This language was explicitly reaffirmed as stating "the guiding principle" in *Central Hardware Co.* v. *NLRB,* 407 U. S. 539, 544.

236; *NLRB* v. *Truckdrivers Union*, 353 U. S. 87, 97. "The responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board." *NLRB* v. *Weingarten, Inc.*, 420 U. S. 251, 266.

For the reasons stated in this opinion, the judgment is vacated and the case is remanded to the Court of Appeals with directions to remand to the National Labor Relations Board, so that the case may be there considered under the statutory criteria of the National Labor Relations Act alone.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring.

Although I agree with MR. JUSTICE WHITE's view concurring in the result that *Lloyd Corp.* v. *Tanner*, 407 U. S. 551 (1972), did not overrule *Food Employees* v. *Logan Valley Plaza*, 391 U. S. 308 (1968), and that the present case can be distinguished narrowly from *Logan Valley*, I nevertheless have joined the opinion of the Court today.

The law in this area, particularly with respect to whether First Amendment or labor law principles are applicable, has been less than clear since *Logan Valley* analogized a shopping center to the "company town" in *Marsh* v. *Alabama*, 326 U. S. 501 (1946). Mr. Justice Black, the author of the Court's opinion in *Marsh*, thought the decisions were irreconcilable.[1] I now agree

---

[1] In his dissent in *Logan Valley*, Mr. Justice Black stated that "*Marsh* was never intended to apply to this kind of situation. . . . [T]he basis on which the *Marsh* decision rested was that the property involved encompassed an area that for all practical purposes had been turned into a town; the area had all the attributes of a town

with Mr. Justice Black that the opinions in these cases cannot be harmonized in a principled way. Upon more mature thought, I have concluded that we would have been wiser in *Lloyd Corp.* to have confronted this disharmony rather than draw distinctions based upon rather attenuated factual differences.[2]

The Court's opinion today clarifies the confusion engendered by these cases by accepting Mr. Justice Black's reading of *Marsh* and by recognizing more sharply the distinction between the First Amendment and labor law issues that may arise in cases of this kind. It seems to me that this clarification of the law is desirable.

MR. JUSTICE WHITE, concurring in the result.

While I concur in the result reached by the Court, I find it unnecessary to inter *Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), and therefore do not join the Court's opinion. I agree that "the constitutional guarantee of free expression has no part to play in a case such as this," *ante,* at 521; but *Lloyd Corp.* v. *Tanner,* 407 U. S. 551 (1972), did not overrule *Logan Valley,* either expressly or implicitly, and I would not, somewhat after the fact, say that it did.

One need go no further than *Logan Valley* itself, for the First Amendment protection established by *Logan Valley* was expressly limited to the picketing of a specific store for the purpose of conveying information with respect to the operation in the shopping center of *that* store:

"The picketing carried on by petitioners was

---

and was exactly like any other town in Alabama. I can find very little resemblance between the shopping center involved in this case and Chickasaw, Alabama." 391 U. S., at 330, 331.

[2] The editorial "we" above is directed primarily to myself as the author of the Court's opinion in *Lloyd Corp.*

directed specifically at patrons of the Weis Market located within the shopping center and the message sought to be conveyed to the public concerned the manner in which that particular market was being operated. We are, therefore, not called upon to consider whether respondents' property rights could, consistently with the First Amendment, justify a bar on picketing which was not thus directly related in its purpose to the use to which the shopping center property was being put." 391 U. S., at 320 n. 9.

On its face, *Logan Valley* does not cover the facts of this case. The pickets of the Butler Shoe Co. store in the North DeKalb Shopping Center were not purporting to convey information about the "manner in which that particular [store] was being operated" but rather about the operation of a warehouse not located on the center's premises. The picketing was thus not "directly related in its purpose to the use to which the shopping center property was being put."

The First Amendment question in this case was left open in *Logan Valley*. I dissented in *Logan Valley,* 391 U. S., p. 337, and I see no reason to extend it further. Without such extension, the First Amendment provides no protection for the picketing here in issue and the Court need say no more. *Lloyd* v. *Tanner* is wholly consistent with this view. There is no need belatedly to overrule *Logan Valley,* only to follow it as it is.

Mr. Justice Marshall, with whom Mr. Justice Brennan joins, dissenting.

The Court today holds that the First Amendment poses no bar to a shopping center owner's prohibiting speech within his shopping center. After deciding this far-reaching constitutional question, and overruling *Food*

*Employees* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), in the process, the Court proceeds to remand for consideration of the statutory question whether the shopping center owner in this case unlawfully interfered with the Butler Shoe Co. employees' rights under § 7 of the National Labor Relations Act, 29 U. S. C. § 157.

In explaining why it addresses any constitutional issue at all, the Court observes simply that the history of the litigation has been one of "shifting positions on the part of the litigants, the Board, and the Court of Appeals," *ante,* at 512, as to whether relief was being sought, or granted, under the First Amendment, under § 7 of the Act, or under some combination of the two. On my reading, the Court of Appeals' decision and, even more clearly, the Board's decision here for review, were based solely on § 7, not on the First Amendment; and this Court ought initially consider the statutory question without reference to the First Amendment—the question on which the Court remands. But even under the Court's reading of the opinions of the Board and the Court of Appeals, the statutory question on which it remands is now before the Court. By bypassing that question and reaching out to overrule a constitutionally based decision, the Court surely departs from traditional modes of adjudication.

I would affirm the judgment of the Court of Appeals on purely statutory grounds. And on the merits of the only question that the Court decides, I dissent from the overruling of *Logan Valley.*

## I

The Court views the history of this litigation as one of "shifting positions" and "considerable confusion." To be sure, the Board's position has not been constant. But the ultimate decisions by the Administrative Law Judge

and by the Board rested solely on § 7 of the NLRA, not on the First Amendment.

As the Court indicates, the Board's initial determination that petitioner violated § 8 (a)(1) of the Act, 29 U. S. C. § 158 (a)(1), was based on its reading of *Logan Valley,* a First Amendment case. But before the Court of Appeals reviewed this initial determination, this Court decided *Lloyd Corp.* v. *Tanner,* 407 U. S. 551 (1972), and *Central Hardware Co.* v. *NLRB,* 407 U. S. 539 (1972), and the Board moved to have the case remanded for reconsideration in light of these two decisions. The Court of Appeals granted the motion.

*Lloyd* and *Central Hardware* demonstrated, each in its own way, that *Logan Valley* could not be read as broadly as some Courts of Appeals had read it. And together they gave a signal to the Board and to the Court of Appeals that it would be wise to pass upon statutory contentions in cases of this sort before turning to broad constitutional questions, the answers to which could no longer be predicted with certainty. See *Central Hardware, supra,* at 548, 549 (MARSHALL, J., dissenting); *Lloyd, supra,* at 584 (MARSHALL, J., dissenting). Taking heed of this signal, the Administrative Law Judge and the Board proceeded on remand to assess the conflicting rights of the employees and the shopping center owner within the framework of the NLRA. The Administrative Law Judge's recommendation that petitioner be found guilty of a § 8 (a)(1) violation rested explicitly on the statutory test enunciated by this Court in *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956). That the Administrative Law Judge supported his "realistic view of the facts" by referring to this Court's "factual view" of the *Logan Valley* case surely cannot be said to alter the judge's explicitly stated legal theory, which was a statutory one.

Even more clearly, the Board's rationale in agreeing with the Administrative Law Judge's recommendation was exclusively a statutory one. Nowhere in the Board's decision, *Hudgens* v. *Local 315, Retail, Wholesale & Dept. Store Union,* 205 N. L. R. B. 628 (1973), is there any reference to the First Amendment or any constitutionally based decision. The Board reached its result "for the reasons specifically set forth in *Frank Visceglia and Vincent Visceglia, t/a Peddie Buildings,"* [1] *ibid.,* a case decided solely on § 7 grounds. In *Visceglia* the Board had specifically declined to treat the picketing area in question as the functional equivalent of a business block and rejected the applicability of *Logan Valley*'s First Amendment analysis, finding an interference with § 7 rights under a "modified" *Babcock & Wilcox* test.[2] When the Board in this case relied upon the rationale of *Visceglia,* it was evidently proceeding under the assumption that the First Amendment had no application. Its ultimate conclusion that petitioner violated § 8 (a)(1) of the Act was purely the result of an "accommodation between [his] property rights and the employees' Section 7 rights." 205 N. L. R. B. 628.

The Court acknowledges that the Court of Appeals' enforcement of the Board's order was based on its view of the employees' § 7 rights. But the Court suggests that the following reference to *Lloyd,* a constitutional

---

[1] 203 N. L. R. B. 265 (1973), enforcement denied, *NLRB* v. *Visceglia,* 498 F. 2d 43 (CA3 1974).

[2] The Board found the "principles of *Babcock & Wilcox* . . . to be applicable," 203 N. L. R. B., at 266–267, but seized upon a factual distinction that the *Babcock & Wilcox* Court had itself suggested—namely, the distinction between activity by employees, as in *Visceglia,* and activity by nonemployees, as in *Babcock & Wilcox.*

case, indicates that the Court of Appeals' decision was infected with constitutional considerations:

> "*Lloyd* burdens the General Counsel with the duty to prove that other locations less intrusive upon Hudgens' property rights than picketing inside the mall were either unavailable or ineffective." 501 F. 2d 161, 169.

A reading of the entire Court of Appeals' opinion, however, demonstrates that this language was not intended to inject any constitutional considerations into the case. The Court of Appeals' analysis began with an evaluation of the statutory criteria urged by the parties.[3] Rejecting both parties' formulations of the appropriate statutory standard, the Court of Appeals adopted a modified version of an approach, suggested by an *amicus,* that incorporates a consideration of the relationship of the protest to the use to which the private property in question is put, and the availability of reasonably effective alternative means of communicating with the intended audience. While the *amicus* had derived its approach from *Lloyd* and *Logan Valley,* two constitutional cases, the Court of Appeals was careful to note that the approach it applied was a statutory, not a constitutional one:

> "Section 7 rights are not necessarily coextensive

---

[3] The Board's General Counsel urged a rule, based upon *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793 (1945), that the employee pickets could not be excluded from the shopping center unless it could be shown that the picketing interfered with the center's normal functioning. While the Board's General Counsel thus did not rely on *Babcock & Wilcox,* the basis for the Board's decision, he still relied on a statutory case, not a constitutional one.

Petitioner argued in the Court of Appeals that under *Babcock & Wilcox* the picketing could be prohibited unless it could be shown that there were no other available channels of communication with the intended audience.

with constitutional rights, *see* Central Hardware v. NLRB, *supra* ([MARSHALL], J., dissenting). Nevertheless, we agree that the rule suggested by amicus, although having its genesis in the constitutional issues raised in *Lloyd,* isolates the factors relevant to determining when private property rights of a shopping center owner should be required to yield to the section 7 rights of labor picketers." 501 F. 2d, at 167.

With that explanation of the Court of Appeals' view of the relevance of *Lloyd,* it is evident that the subsequent reference to *Lloyd,* quoted out of context by the Court, was not intended to alter the purely statutory basis of the Court of Appeals' decision.[4]

In short, the Board's decision was clearly unaffected by constitutional considerations, and I do not read the Court of Appeals' opinion as intimating that its statutory result was constitutionally mandated. In its present posture, the case presents no constitutional question to the Court. Surely it is of no moment that the Board through its counsel now urges this Court to decide, as part of its statutory analysis, what result is compelled by the First Amendment. The posture of the case is determined by the decisions of the Board and the Court of Appeals, not by the arguments advanced in the Board's brief. Since I read those decisions as purely statutory ones, I would proceed to consider the purely statutory question whether, assuming that petitioner is not restricted by the First Amendment, his actions never-

---

[4] Indeed, the Court of Appeals quite clearly viewed the Administrative Law Judge's recommendation and the Board's decision as statutorily based. And the court did not even make the factual finding of functional equivalence to a business district that it recognized as a prerequisite to the application of the First Amendment. 501 F. 2d, at 164.

theless violated § 7 of the Act. This is precisely the issue on which the Court remands the case.

At the very least it is clear that neither the Board nor the Court of Appeals decided the case *solely* on First Amendment grounds. The Court itself acknowledges that both decisions were based on § 7. The most that can be said, and all that the Court suggests, is that the Court of Appeals' view of § 7 was colored by the First Amendment. But even if that were the case, this Court ought not decide any First Amendment question—particularly in a way that requires overruling one of our decisions—without first considering the statutory question without reference to the First Amendment. It is a well-established principle that constitutional questions should not be decided unnecessarily. See, *e. g., Hagans* v. *Lavine,* 415 U. S. 528, 543, 549 (1974); *Rosenberg* v. *Fleuti,* 374 U. S. 449 (1963); *Ashwander* v. *TVA,* 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring). If the Court of Appeals disregarded that principle, that is no excuse for this Court's doing so.

As already indicated, the Board, through its counsel, urges the Court to apply First Amendment considerations in defining the scope of § 7 of the Act. The Board takes this position because it is concerned that the scope of § 7 not fall short of the scope of the First Amendment, the result of which would be that picketing employees could obtain greater protection by court suits than by invoking the procedures of the NLRA. While that general concern is a legitimate one, it does not justify the constitutional adjudication undertaken by the Court. If it were undisputed that the pickets in this case enjoyed some degree of First Amendment protection against interference by petitioner, it might be difficult to separate a consideration of the scope of that First Amendment protection from an analysis of the scope of

protection afforded by § 7. But the constitutional question that the Court decides today is whether the First Amendment operates to restrict petitioner's actions in any way at all, and that question is clearly severable, at least initially, from a consideration of § 7's scope—as proved by the Court's remand of the case.

Thus even if, as the Court suggests, the Court of Appeals' view of § 7 was affected by the First Amendment, the Court still could have proceeded initially to decide the statutory question divorced of constitutional considerations. I cannot understand the Court's bypassing that purely statutory question to overrule a First Amendment decision less than 10 years old. And I certainly cannot understand the Court's remand of the purely statutory question to the Board, whose decision was so clearly unaffected by any constitutional considerations that the Court does not even suggest otherwise.

## II

On the merits of the purely statutory question that I believe is presented to the Court, I would affirm the judgment of the Court of Appeals. To do so, one need not consider whether consumer picketing by employees is subject to a more permissive test under § 7 than the test articulated in *Babcock & Wilcox* for organizational activity by nonemployees. In *Babcock & Wilcox* we stated that an employer "must allow the union to approach his employees on his property" [5] if the employees are "beyond the reach of reasonable efforts to communicate with them," 351 U. S., at 113—that is, if "other means" of communication are not "readily available." *Id.*, at 114. Thus the general standard that emerges

---

[5] It is irrelevant, in my view, that the property in this case was owned by the shopping center owner rather than by the employer. The nature of the property interest is the same in either case.

from *Babcock & Wilcox* is the ready availability of reasonably effective alternative means of communication with the intended audience.

In *Babcock & Wilcox* itself, the intended audience was the employees of a particular employer, a limited identifiable group; and it was thought that such an audience could be reached effectively by means other than entrance onto the employer's property—for example, personal contact at the employees' living quarters, which were "in reasonable reach." *Id.,* at 113. In this case, of course, the intended audience was different, and what constitutes reasonably effective alternative means of communication also differs. As the Court of Appeals noted, the intended audience in this case "was only identifiable as part of the citizenry of greater Atlanta until it approached the store, and thus for the picketing to be effective, the location chosen was crucial unless the audience could be known and reached by other means." 501 F. 2d, at 168. Petitioner contends that the employees could have utilized the newspapers, radio, television, direct mail, handbills, and billboards to reach the citizenry of Atlanta. But none of those means is likely to be as effective as on-location picketing: the initial impact of communication by those means would likely be less dramatic, and the potential for dilution of impact significantly greater. As this Court has observed:

> "Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word." *Hughes* v. *Superior Court,* 339 U. S. 460, 465 (1950).

In addition, all of the alternatives suggested by petitioner are considerably more expensive than on-site picketing. Certainly *Babcock & Wilcox* did not require resort to the mass media,[6] or to more individualized efforts on a scale comparable to that which would be required to reach the intended audience in this case.

Petitioner also contends that the employees could have picketed on the public rights-of-way, where vehicles entered the shopping center. Quite apart from considerations of safety, that alternative was clearly inadequate: prospective customers would have had to read the picketers' placards while driving by in their vehicles—a difficult task indeed. Moreover, as both the Board and the Court of Appeals recognized, picketing at an entrance used by customers of all retail establishments in the shopping center, rather than simply customers of the Butler Shoe Co. store, may well have invited undesirable secondary effects.

In short, I believe the Court of Appeals was clearly correct in concluding that "alternatives to picketing inside the mall were either unavailable or inadequate." 501 F. 2d, at 169. Under *Babcock & Wilcox*, then, the picketing in this case was protected by § 7. I would affirm the judgment of the Court of Appeals on that basis.

### III

Turning to the constitutional issue resolved by the Court, I cannot escape the feeling that *Logan Valley* has been laid to rest without ever having been accorded a proper burial. The Court today announces that "the ultimate holding in *Lloyd* amounted to a total rejection

---

[6] The only alternative means of communication referred to in *Babcock & Wilcox* were "personal contacts on streets or at home, telephones, letters or advertised meetings to get in touch with the employees." 351 U. S., at 111.

of the holding in *Logan Valley." Ante*, at 518. To be sure, some Members of the Court, myself included, believed that *Logan Valley* called for a different result in *Lloyd* and alluded in dissent to the possibility that "it is *Logan Valley* itself that the Court finds bothersome." 407 U. S., at 570, 584 (MARSHALL, J., dissenting). But the fact remains that *Logan Valley* explicitly reserved the question later decided in *Lloyd*, and *Lloyd* carefully preserved the holding of *Logan Valley*. And upon reflection, I am of the view that the two decisions are reconcilable.

A

In *Logan Valley* the Court was faced with union picketing against a nonunion supermarket located in a large shopping center. Our holding was a limited one:

> "All we decide here is that because the shopping center serves as the community business block 'and is freely accessible and open to the people in the area and those passing through,' *Marsh* v. *Alabama*, 326 U. S., at 508, the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put." 391 U. S., at 319–320 (footnote omitted).

We carefully noted that we were "not called upon to consider whether respondents' property rights could, consistently with the First Amendment, justify a bar on picketing which was not . . . directly related in its purpose to the use to which the shopping center property was being put." *Id.,* at 320 n. 9.

*Lloyd* involved the distribution of antiwar handbills in a large shopping center, and while some of us viewed

the case differently, 407 U. S., at 570, 577–579 (MAR-SHALL, J., dissenting), the Court treated it as presenting the question left open in *Logan Valley*. But the Court did no more than decide that question. It preserved the holding of *Logan Valley*, as limited to cases in which (1) the picketing is directly related in its purpose to the use to which the shopping center property is put, and (2) "no other reasonable opportunities for the pickets to convey their message to their intended audience [are] available." 407 U. S., at 563.

The Court today gives short shrift to the language in *Lloyd* preserving *Logan Valley*, and quotes extensively from language that admittedly differs in emphasis from much of the language of *Logan Valley*. But even the language quoted by the Court says no more than that the dedication of the Lloyd Center to public use was more limited than the dedication of the company town in *Marsh* v. *Alabama*, 326 U. S. 501 (1946), and that the pickets in *Lloyd* were not entitled to exercise "the asserted First Amendment rights"—that is, the right to distribute antiwar handbills.

Any doubt about the limited scope of *Lloyd* is removed completely by a consideration of *Central Hardware Co.* v. *NLRB*, 407 U. S. 539 (1972), decided the same day as *Lloyd*. In *Central Hardware* the Court was faced with solicitation by nonemployee union organizers on a parking lot of a retail store that was not part of a shopping center complex—activity clearly related to the use to which the private property had been put. The Court found the activity unprotected by the First Amendment, but in a way that explicitly preserved the holding in *Logan Valley*. The Court could have held that the First Amendment has no application to use-related activity on privately owned business property, thereby rejecting *Logan Valley*, but instead the Court chose to

distinguish the parking lot in *Central Hardware* from the shopping center complex in *Logan Valley*. Rejecting the argument that the opening of property to the general public suffices to activate the prohibition of the First Amendment, the Court explained:

> "This analysis misconceives the rationale of *Logan Valley*. *Logan Valley* involved a large commercial shopping center which the Court found had displaced, in certain relevant respects, the functions of the normal municipal 'business block.' First and Fourteenth Amendment free-speech rights were deemed infringed under the facts of that case when the property owner invoked the trespass laws of the State against the pickets.
>
> "Before an owner of private property can be subjected to the commands of the First and Fourteenth Amendments the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use. . . . The only fact relied upon for the argument that Central's parking lots have acquired the characteristics of a public municipal facility is that they are 'open to the public.' Such an argument could be made with respect to almost every retail and service establishment in the country, regardless of size or location. To accept it would cut *Logan Valley* entirely away from its roots in *Marsh.*" 407 U. S., at 547 (footnote omitted).

If, as the Court tells us, "the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case," *ante,* at 518, one wonders why the Court in *Central Hardware,* decided the same day as *Lloyd,* implicitly reaffirmed *Logan Valley*'s rationale.

## B

It is inescapable that after *Lloyd, Logan Valley* remained "good law," binding on the state and federal courts. Our institutional duty in this case, if we consider the constitutional question at all, is to examine whether *Lloyd* and *Logan Valley* can continue to stand side by side, and, if they cannot, to decide which one must fall. I continue to believe that the First Amendment principles underlying *Logan Valley* are sound, and were unduly limited in *Lloyd.* But accepting *Lloyd,* I am not convinced that *Logan Valley* must be overruled.

The foundation of *Logan Valley* consisted of this Court's decisions recognizing a right of access to streets, sidewalks, parks, and other public places historically associated with the exercise of First Amendment rights. *E. g., Hague* v. *CIO,* 307 U. S. 496, 515–516 (1939) (opinion of Roberts, J.); *Schneider* v. *State,* 308 U. S. 147 (1939); *Cantwell* v. *Connecticut,* 310 U. S. 296, 308 (1940); *Cox* v. *New Hampshire,* 312 U. S. 569, 574 (1941); *Jamison* v. *Texas,* 318 U. S. 413 (1943); *Saia* v. *New York,* 334 U. S. 558 (1948). Thus, the Court in *Logan Valley* observed that access to such forums "cannot constitutionally be denied broadly and absolutely." 391 U. S., at 315. The importance of access to such places for speech-related purposes is clear, for they are often the only places for effective speech and assembly.

*Marsh* v. *Alabama, supra,* which the Court purports to leave untouched, made clear that in applying those cases granting a right of access to streets, sidewalks, and other public places, courts ought not let the formalities of title put an end to analysis. The Court in *Marsh* observed that "the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the

property belongs to a private corporation." 326 U. S., at 503. That distinction was not determinative:

> "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.*, at 506.

Regardless of who owned or possessed the town in *Marsh*, the Court noted, "the public . . . has an identical interest in the functioning of the community in such manner that the channels of communication remain free," *id.*, at 507, and that interest was held to prevail.

The Court adopts the view that *Marsh* has no bearing on this case because the privately owned property in *Marsh* involved all the characteristics of a typical town. But there is nothing in *Marsh* to suggest that its general approach was limited to the particular facts of that case. The underlying concern in *Marsh* was that traditional public channels of communication remain free, regardless of the incidence of ownership. Given that concern, the crucial fact in *Marsh* was that the company owned the traditional forums essential for effective communication; it was immaterial that the company also owned a sewer system and that its property in other respects resembled a town.

In *Logan Valley* we recognized what the Court today refuses to recognize—that the owner of the modern shopping center complex, by dedicating his property to public use as a business district, to some extent displaces the "State" from control of historical First Amendment forums, and may acquire a virtual monopoly of places suitable for effective communication. The roadways, parking lots, and walkways of the modern shopping cen-

ter may be as essential for effective speech as the streets and sidewalks in the municipal or company-owned town.[7] I simply cannot reconcile the Court's denial of any role for the First Amendment in the shopping center with *Marsh*'s recognition of a full role for the First Amendment on the streets and sidewalks of the company-owned town.

My reading of *Marsh* admittedly carried me farther than the Court in *Lloyd,* but the *Lloyd* Court remained responsive in its own way to the concerns underlying *Marsh.* *Lloyd* retained the availability of First Amendment protection when the picketing is related to the function of the shopping center, and when there is no other reasonable opportunity to convey the message to the intended audience. Preserving *Logan Valley* subject to *Lloyd*'s two related criteria guaranteed that the First Amendment would have application in those situations in which the shopping center owner had most clearly monopolized the forums essential for effective communication. This result, although not the optimal one in my view, *Lloyd Corp.* v. *Tanner,* 407 U. S., at 579–583 (MARSHALL, J., dissenting), is nonetheless defensible.

In *Marsh,* the private entity had displaced the "state" from control of all the places to which the public had historically enjoyed access for First Amendment purposes, and the First Amendment was accordingly held fully applicable to the private entity's conduct. The shopping center owner, on the other hand, controls only

---

[7] No point would be served by adding to the observations in *Logan Valley* and my dissent in *Lloyd* with respect to the growth of suburban shopping centers and the proliferation of activities taking place in such centers. See *Logan Valley,* 391 U. S., at 324; *Lloyd,* 407 U. S., at 580, 585–586. See also Note, Lloyd Corp. v. Tanner: The Demise of Logan Valley and the Disguise of Marsh, 61 Geo. L. J. 1187, 1216–1219 (1973).

a portion of such places, leaving other traditional public forums available to the citizen. But the shopping center owner may nevertheless control all places essential for the effective undertaking of some speech-related activities—namely, those related to the activities of the shopping center. As for those activities, then, the First Amendment ought to have application under the reasoning of *Marsh,* and that was precisely the state of the law after *Lloyd.*

The Court's only apparent objection to this analysis is that it makes the applicability of the First Amendment turn to some degree on the subject matter of the speech. But that in itself is no objection, and the cases cited by the Court to the effect that government may not "restrict expression because of its message, its ideas, its subject matter, or its content," *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95 (1972), are simply inapposite. In those cases, it was clearly the government that was acting, and the First Amendment's bar against infringing speech was unquestionably applicable; the Court simply held that the government, faced with a general command to permit speech, cannot choose to forbid some speech because of its message. The shopping center cases are quite different; in these cases the primary regulator is a private entity whose property has "assume[d] to some significant degree the functional attributes of public property devoted to public use." *Central Hardware Co.* v. *NLRB,* 407 U. S., at 547. The very question in these cases is whether, and under what circumstances, the First Amendment has any application at all. The answer to that question, under the view of *Marsh* described above, depends to some extent on the subject of the speech the private entity seeks to regulate, because the degree to which the private entity monopolizes the effective channels of communication

may depend upon what subject is involved.[8]    This
limited reference to the subject matter of the speech
poses none of the dangers of government suppression
or censorship that lay at the heart of the cases cited by
the Court.    See, *e. g., Police Dept. of Chicago* v. *Mosley,
supra,* at 95–96.    It is indeed ironic that those cases,
whose obvious concern was the promotion of free speech,
are cited today to require its surrender.

In the final analysis, the Court's rejection of any
role for the First Amendment in the privately owned
shopping center complex stems, I believe, from an overly
formalistic view of the relationship between the institu-
tion of private ownership of property and the First
Amendment's guarantee of freedom of speech.    No one
would seriously question the legitimacy of the values
of privacy and individual autonomy traditionally associ-
ated with privately owned property.    But property that
is privately owned is not always held for private use,
and when a property owner opens his property to public
use the force of those values diminishes.    A degree of
privacy is necessarily surrendered; thus, the privacy
interest that petitioner retains when he leases space to
60 retail businesses and invites the public onto his land
for the transaction of business with other members of
the public is small indeed.    Cf. *Paris Adult Theatre I* v.
*Slaton,* 413 U. S. 49, 65–67 (1973).    And while the
owner of property open to public use may not auto-
matically surrender any of his autonomy interest in
managing the property as he sees fit, there is nothing
new about the notion that that autonomy interest must
be accommodated with the interests of the public.    As

---

[8] See The Supreme Court, 1967 Term, 82 Harv. L. Rev. 63, 135–
138 (1968).

this Court noted some time ago, albeit in another context:

> "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created." *Munn* v. *Illinois,* 94 U. S. 113, 126 (1877).

The interest of members of the public in communicating with one another on subjects relating to the businesses that occupy a modern shopping center is substantial. Not only employees with a labor dispute, but also consumers with complaints against business establishments, may look to the location of a retail store as the only reasonable avenue for effective communication with the public. As far as these groups are concerned, the shopping center owner has assumed the traditional role of the state in its control of historical First Amendment forums. *Lloyd* and *Logan Valley* recognized the vital role the First Amendment has to play in such cases, and I believe that this Court errs when it holds otherwise.