IOWA BEEF PROCESSORS,
INC., Plaintiff,

v.

Patrick E. GORMAN, Harry R. Poole, and Sam Talarico, as representatives of the members of Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO; Irving Stern; Albert J. Krieger; Lex Hawkins; John A. Cochrane; Hughes A. Bagley; and Hans Aarsen, Defendants.

No. C 77–4040.

United States District Court,
N. D. Iowa, W. D.

Oct. 4, 1979.

D. Douglas Titus, Sioux City, Iowa, Edward W. Rothe, James T. Malysiak, Chicago, Ill., for plaintiff.

Jesse I. Levine, Shaw & Levine, Garden City, N. Y., for intervenor Bohack Corp.

Richard F. Watt and Irving M. King, Chicago, Ill., Harry H. Smith, Sioux City, Iowa, for Amalgamated Meat Cutters.

Marvin F. Heidman, Sioux City, Iowa, for Hans Aarsen.

Wm. J. Rawlings, Sioux City, Iowa, for Hughes Bagley.

John J. Greer, Spencer, Iowa, for Cochrane and Hawkins.

Frederick S. Nordenson, Sioux City, Iowa, Stephen M. Glynn, Milwaukee, Wis., for Krieger.

Harold I. Cammer, Cammer & Shapiro, New York City, for Stern.

## ORDER

McMANUS, Chief Judge.

This matter is before the court on plaintiff's resisted April 28, 1978 motion to dismiss defendants Gorman, Poole and Talarico's counterclaim. Granted.

On August 1, 1977, plaintiff (IBP) filed its amended complaint against Gorman, Poole, and Talarico, as officers and representatives of the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (AMCBW).[1]

On March 21, 1978, these defendants filed their answer and counterclaim against IBP. The counterclaim, brought as a class action,[2] is framed in two counts, both of which are jurisdictionally premised on 28 U.S.C. §§ 1331 and 1343. Count 1 asserts the counterclaim pursuant to 42 U.S.C. § 1985(3),[3] while count 2 is separately premised upon 42 U.S.C. § 1986.[4] Count 1 alleges that IBP has conspired with other named persons and entities to deprive the class members of their rights, privileges and immunities protected constitutionally under the first amendment guarantees of free association and the fourteenth amendment guarantees to equal protection of the laws; and statutorily under the federal labor laws. Count 2 reiterates those allegations and further alleges IBP's knowledge of the conspiracy and failure to prevent its implementation.

Both counts allege additionally that IBP and its co-conspirators committed in furtherance of the alleged conspiracy a number of overt acts involving generally a series of collusive plant shutdowns, sham name changes, and a sweet-heart contract with an alternative labor organization.[5]

Couching the counterclaim in general terms of deprivation of constitutional and statutory rights,[6] defendants further allege

1. The amended complaint also named six other defendants, who are not parties to the counterclaim at issue here. The amended complaint alleged breach of a settlement contract, inducement to breach a settlement contract, breach of fiduciary duties, corporate defamation, criminal barratry, and conspiracy.

2. The purported class includes members of AMCBW who are employed or have been employed by IBP and persons who have been or are seeking to become members of AMCBW by reason of their employment with IBP.

3. 42 U.S.C. § 1985(3) states in pertinent part:
"If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

4. 42 U.S.C. § 1986 provides in pertinent part:
"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; . . . . But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."

5. See ¶ s 11 & 12 in Appendix, *infra*.

6. *See* ¶ s 10 & 13 in Appendix, *infra*. Defendants' counterclaim does not in any instance make direct reference or otherwise assert a claim under the federal labor relations acts, *see* 29 U.S.C. §§ 141, *et seq.* It is not disputed, and the court must conclude even in light of the liberal notice pleading in federal practice, that defendants assert no claim other than that specifically arising under the Civil Rights statutes, 42 U.S.C. §§ 1985(3) and 1986. For example, defendants concede in their brief that they are not directly asserting a claim under 29 U.S.C. § 185 for breach of collective bargaining agreements since the allegations of the counterclaim clearly indicate that the collective bargaining agreements that might be at issue had expired at the time the counterclaim was filed. There-

in both counts that the conspiracy and its implementation were perpetrated with the objective of destroying the AMCBW and damaging the class members in a number of particulars.[7]

On April 28, 1978, IBP filed its motion to dismiss the counterclaim (1) for lack of jurisdiction on grounds that defendants' counterclaim is in essence one for unfair labor practices under 29 U.S.C. § 158 and therefore is pre-emptively within the primary jurisdiction of the National Labor Relations Board; and (2) for failure to state a claim on grounds that defendants' claim does not arise under 42 U.S.C. §§ 1985(3) and 1986 because the purported class is not protected within the meaning of those statutes. Defendants resist the motion on both grounds. It is the court's conclusion generally that plaintiff's motion is well taken and the counterclaim will be dismissed for lack of jurisdiction and failure to state a claim.

### Jurisdiction

#### A. Breach of Labor Agreement.

■ Defendants argue that jurisdiction is not pre-empted because the counterclaim seeks to remedy the denial of the class members' rights to the fruits of their collective bargaining agreement. It is true that courts have jurisdiction, under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to entertain suits for breach of collective bargaining agreements. *See, e. g., Vaca v. Sipes,* 386 U.S. 171, 179–180, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Defendants concede, however, that their counterclaim is not directly predicated on § 301 since the collective bargaining agreements had expired at the time of filing. And, of course, defendants specifically assert their claim pursuant to 49 U.S.C. §§ 1985(3) and 1986.

The facts alleged in the counterclaim do indicate that the conspiracy ran from mid-1975 through at least the summer of 1977, and that at least one collective bargaining agreement between IBP and the AMCBW was in effect from 1973 to January, 1977. These allegations, however, are not predicated on a claim for breach of a collective bargaining agreement, but rather on §§ 1985(3) and 1986. Therefore, the motion to dismiss for lack of jurisdiction will be granted for reasons set forth in the discussion, *infra,* on pre-emption.

#### B. Pre-emption.

In *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1969), the United States Supreme Court set forth what has come to be known as the labor law "pre-emption" doctrine, the second prong of which states:

> "When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act [29 USC §§ 157, 158], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . ."

*Id.,* at 245, 79 S.Ct. at 780.

The Supreme Court has further indicated that it is not the legal categories in which the claim is framed that are the controlling center of focus, but rather the conduct charged:

> "Pre-emption . . . is designed to shield the system from conflicting regulation of conduct. It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern."

*Motor Coach Employees v. Lockridge,* 403 U.S. 274, 292, 91 S.Ct. 1909, 1920, 29 L.Ed.2d

---

fore, defendants' counterclaim is in actuality what it appears and purports to be on its face: a claim for violation of civil rights under 42 U.S.C. §§ 1985(3) and 1986.

7. Defendants allege deprivation of class members' rights under the first and fourteenth amendments to associate with, become and remain members of AMCBW. They also allege deprivation of class members statutory rights, under federal labor laws, to be free from coer-

cion, harassment, intimidation and discrimination; to be free from termination, lay-off or other discharge without just and legitimate cause; to earn a livelihood; to enjoy benefits of their right to bargain collectively; to enjoy the fruits of a collective bargaining agreement; and, finally, a denial of statutory rights to reinstatement and backpay. *See* ¶ 14 in Appendix, *infra.*

473 (1971). *See also Local 100, United Assoc. of Journeymen & Apprentices v. Borden,* 373 U.S. 690, 698, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963).

There exist, however, a number of statutory exceptions and judicially fashioned clarifications to the *Garmon* pre-emption doctrine. For example, as indicated *supra,* federal courts have jurisdiction under 29 U.S.C. § 185 to consider claims for breach of collective bargaining agreements even when such breach also constitutes a § 8 unfair labor practice. *See e. g., Vaca v. Sipes,* 386 U.S. 171, 179–180, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). And, the *Garmon* pre-emption rule does not apply

> "where the activity regulated [is] a merely peripheral concern of the [federal labor laws] . . . [o]r where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [it can] not [be] infer[red] that Congress [has] deprived the [courts] of the power to act."

*Garmon, supra,* 359 U.S. at 243–44, 79 S.Ct. at 779, quoted in *Linn v. Plant Guard Workers,* 383 U.S. 53, 59, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

The principal concern of the pre-emption doctrine has always been the risk of conflicting pronouncements and resulting interference with the federal labor laws and their effectuating scheme. *Compare, Garmon, supra,* 359 U.S. at 242–43, 79 S.Ct. 773 *with Sears, Roebuck and Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 203, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). Application of the pre-emption doctrine depends "upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies of concurrent judicial and administrative remedies." *Vaca v. Sipes, supra,* 386 U.S. at 180, 87 S.Ct. at 911–12. Moreover, the court has recently indicated that

> "The primary jurisdiction rationale [set forth in *Garmon* and applicable here where the alleged activity is "arguably prohibited"] justifies pre-emption only in

situations in which an aggrieved party has a reasonable opportunity either to invoke the Board's jurisdiction [it]self or else to induce [its] adversary to do so." *Sears, supra,* 436 U.S. at 201, 98 S.Ct. at 1760.

Thus, the critical inquiry has always been "whether the controversy presented to the . . . court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board." *Id.,* at 197, 98 S.Ct. at 1758. *Compare also Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657 (1966); *Farmer v. Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).

■ Plaintiff's basic argument in support of its motion to dismiss is that the counterclaim is pre-empted because it essentially alleges conspiratorial activity arguably constituting unfair labor practices prohibited by § 8 of the NLRA, which defendants had opportunity to present to the NLRB. It is the court's general conclusion that plaintiff's motion is well taken and the counterclaim should be dismissed as pre-empted. In reaching this conclusion, however, the court has had to resolve for itself the principal argument made by defendants that the counterclaim fits within the delineated exceptions to the pre-emption doctrine, thus precluding dismissal.

Defendants argue generally that their counterclaim principally seeks to remedy an alleged conspiracy to deprive the asserted class of its constitutional and statutory rights and that since courts clearly have concurrent jurisdiction to decide constitutional issues pre-emption does not apply. Defendants further contend that the underlying claim is for a § 1985(3) conspiracy involving a controversy and issues merely peripheral to the labor laws.

The court does not agree. Defendants' counterclaim, although framed in constitutional terms of first amendment rights to association, cannot be deemed a constitutional claim *per se.* The Constitution proscribes governmental not private conduct. This litigation involves only private entities. Indeed, in *Hudgens v. NLRB,* 424 U.S. 507,

96 S.Ct. 1029, 47 L.Ed.2d 196 (1976)—a case cited by defendants in support of their position—the United States Supreme Court noted the truism that

"the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state. . . . Thus, while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself."

*Id.,* at 513, 96 S.Ct. at 1033.[8]

Thus, although defendants attempt to frame their counterclaim in first amendment terms, upon a closer examination it is evident that their claim is in actuality a statutory one, for infringement of statutory rights to the free and equal exercise of labor union affiliation. As the Supreme Court indicated in *Lockridge, supra,* 403 U.S. at 292, 91 S.Ct. 1909 the court must carefully look beyond the legal categories in which defendants present their claim to the actual interests asserted and to the offend-

ing conduct alleged. *Accord, Vaca v. Sipes, supra,* 386 U.S. at 180, 87 S.Ct. 903.

To be precise, defendants premise their counterclaim upon alleged conspiratorial deprivation by private entities of rights to labor union association, which are statutorily not constitutionally[9] guaranteed. If such claim is jurisdictionally cognizable in this court it can be so only under either the federal labor or other statutory laws as asserted by defendants. Defendants, here, have chosen to assert their claim pursuant to a civil rights statute—42 U.S.C. § 1985(3). But the mere assertion of a claim pursuant to § 1985(3), otherwise jurisdictionally cognizable in this court, does not end inquiry where, as here, the *Garmon* labor pre-emption doctrine is implicated. As the Supreme Court indicated, the critical inquiry in such situations is whether the asserted claim involves a controversy identical to that which could be adjudicated by the National Labor Relations Board. Viewed in these terms, it is the court's overall conclusion that defendants' counterclaim cannot be properly adjudicated with-

---

**8.** Moreover, the *Hudgens* Court specifically held:

". . . that under the present state of the law the constitutional guarantee of free expression has no part to play in a case such as this." *Id.* at 521, 96 S.Ct. at 1037.

To the extent that the underlying labor controversy in *Hudgens* involved only private parties, the Court's ruling in that case and its attendant discussion of constitutionally related interests, *see id.* at 512–21, 96 S.Ct. 1029, would appear to be supportive of this court's reasoning with respect to defendants' "constitutional interests" argument here.

**9.** Nor do the other decisions cited by defendants in support of their "constitutional interests" argument,—*Fulton v. Emerson,* 420 F.2d 527 (5th Cir. 1969) *cert. den.* 398 U.S. 903, 90 S.Ct. 1689, 26 L.Ed.2d 61 (1970); *National Union v. City of New Rochelle,* 83 Lab.Cas. ¶ 10,434 (CCH) (S.D.N.Y., Feb. 2, 1978)—indicate the contrary. Indeed, they may more appropriately be viewed as supporting this court's general conclusions relating to jurisdictional pre-emption.

Both cases involved claims pursuant to 42 U.S.C. §§ 1983 and 1985(3)—and 1986 in *Fulton*—alleging conspiracy and violent acts committed by employers, private citizens, and police and other public officials against union members. In ruling that labor pre-emption did

not apply, the courts specifically highlighted that the claims were for violation of constitutional rights under color of state law and through the medium of an illegal conspiracy *with public officials.* Thus, state action was involved and constitutional guarantees were *directly* and *immediately* implicated. Moreover, directly in *New Rochelle* and impliedly in *Fulton,* the courts indicated that, if through further elucidation of the facts it became apparent that the allegations of governmental involvement in the conspiracy were unsupported, pre-emption might be availing. *See Fulton* at 530 and *New Rochelle* at p. 17,733.

Here, the situation differs greatly. There is no allegation of governmental intrusion into the alleged conspiratorial activity. The underlying controversy involves solely private parties—an "employer", and actual or would-be members of a labor organization. Clearly, the NLRB would have no authority over all the parties, and specifically over the government officials, in the *New Rochelle* and *Fulton* cases. It would, however, have such authority over all the parties in this case. *New Rochelle* and *Fulton* are clearly distinguishable from the instant case in that they involved state action and were, therefore, *directly* premised upon constitutional guarantees.

out resolution of the merits of the underlying labor dispute, is in essence identical to an unfair labor practice claim, and as such must be jurisdictionally viewed as pre-empted.

In *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971), the Supreme Court delineated the essential elements for a § 1985(3) civil rights claim, which are:

". . . that the defendants [plaintiff IBP here] did (1) 'conspire . . .' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.' [The complaint] must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of [the] conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'"

Defendants contend that their counterclaim is sufficient to meet the elements outlined in *Griffin* and, therefore, is properly within the jurisdiction of this court. On its face and so far as it goes, the contention is true. But it also ignores the fact that the conspiratorial *acts* alleged in the counterclaim—element (3) in the *Griffin* outline—*arguably*

constitute unfair labor practices *prohibited* by § 8 of the NLRA. Since the conspiratorial conduct alleged is "arguably prohibited" by the NLRA, the *Garmon* pre-emption issue is raised, and the court must inquire beyond the initial question whether defendants' counterclaim sufficiently alleges a § 1985(3) civil rights claim. The court must further inquire whether the underlying controversy is identical, or merely peripheral, to that which could have been presented to the Labor Board. *See Sears, supra,* 436 U.S. at 202–03, 98 S.Ct. 1745.

The court deems it identical to an unfair labor practice claim for the following reasons. In deciding defendants' "§ 1985(3) civil rights" claim, the court would have to look to the *acts* done in furtherance of the *object* of the conspiracy (element (3) in *Griffin, supra*). In doing so, the court would have to adjudicate (1) what acts were done, (2) what the object of the alleged conspiracy was, and (3) what rights were violated by those acts. Adjudication of such issues would of necessity involve interpretation and enforcement of §§ 7 and 8 of the NLRA [10] because the class members' associational rights alleged to be deprived are inherently characterized by their actual or would-be labor union affiliation and because the gravamen of defendants' claim relates to the alleged purpose and objective of the challenged conspiracy, to-wit: destruction of AMCBW as a labor organiza-

---

**10.** Section 7 of the NLRA, 29 U.S.C. § 157, provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

Compare this to ¶ s 13 and 14 of defendants' counterclaim in Appendix, *infra.*

Section 8(a) of the NLRA, 29 U.S.C. § 158(a), provides in pertinent part:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; . . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization;

. . . . .

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

Compare this with ¶ s 11, 12 & 14 of defendants' counterclaim in Appendix, *infra.*

tion and/or interference with the class members' rights to free and equal affiliation with AMCBW.

In short, the controversy presented to this court is identical to that which defendants could have presented to the Labor Board under § 8 of the NLRA. In such circumstances, and under the *Garmon* preemption principles, adjudication of that controversy in the first instance should more properly be made by the Board. Thus, the court views plaintiff's motion to dismiss for lack of jurisdiction as well taken and it will be granted. For further support of this decision, *see Ferdnance v. Automobile Transport, Inc.,* 83 Lab.Cas. ¶ 10,402 (CCH) (E.D.Mich., January 11, 1978). *Compare also United States v. DeLaurentis,* 491 F.2d 208 (2d Cir. 1974).

### Failure to State a Claim

■ Even assuming that jurisdiction over the 42 U.S.C. §§ 1985(3) and 1986 claims is not pre-empted, the court is of the further opinion that defendants have failed to state cognizable claims under those statutes. This is based upon the court's conclusion that defendants do not represent a "protected class" within the meaning of §§ 1985(3) and 1986.

In holding that § 1985(3) could reach private conspiracies, the United States Supreme Court, in *Griffin v. Breckenridge, supra,* 403 U.S. 88, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), also stated that there must be shown some racial, or "otherwise class-based invidiously discriminatory animus." The *Griffin* court made it clear that § 1985(3) is not intended to cover all conspiracies to interfere with the rights of others. 403 U.S. at 101, 91 S.Ct. 1790. To do so would in effect amount to treating that section as a general tort law. *Id.* Rather, under § 1985(3), the cognizable class status must be shown by facts other than those indicating the mere common possession of a right deprived. *Lopez v. Arrowhead Ranches,* 523 F.2d 924, 928 (9th Cir. 1975). Thus, here, the purported class does not meet the definition of a cognizable "class" within the meaning of § 1985(3).

Even if defendants' stated class could come within § 1985(3), the statute applies only in cases where the alleged discriminatory motive is of a kind akin to racial animus. *See Western Telecasters v. Cal. Fed. of Labor,* 415 F.Supp. 30 (S.D.Cal. 1976); *Arnold v. Tiffany,* 359 F.Supp. 1034 (C.D.Cal.1973), *aff'd* 487 F.2d 216 (9th Cir. 1973). The Court of Appeals for the Eighth Circuit has adhered to this construction in *Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971). There, the defendants purportedly acting on behalf of black citizens of the city, had been continually disrupting church services. The court held that the disruption was based on racial and economic motives and applied § 1985(3). Other class-based conspiracies held to involve discrimination akin to racial animus, thereby actionable under § 1985(3), concern discrimination based on religion and national origin. *See, Marlowe v. Fisher Body,* 489 F.2d 1057, 1059, 1063–65 (6th Cir. 1973); *Action v. Gannon, supra.* No such motives have been alleged here.

Further, in *Western Telecasters v. Cal. Fed. of Labor, supra,* the court was confronted with an alleged class somewhat similar to the one stated here and held that plaintiff's complaint—alleging discrimination against employees of a non-union entity—was not actionable under § 1985(3). Therefore, defendants' counterclaim here alleging a conspiracy to discriminate against actual and would-be union employees must also fail since no racial or otherwise cognizable class-based animus has been alleged. Plaintiff's motion to dismiss the counterclaim for failure to state a § 1985(3) claim is well taken and will be granted. *See also Great American Federal Savings & Loan Association v. Novotny,* —— U.S. ——, —— ——, ——, ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (majority opinion) (Powell, J., concurring) (Stevens, J., concurring) (U.S. June 11, 1979); *Ferdnance v. Automobile Transport, Inc.,* 83 Lab.Cas. ¶ 10,402 (CCH) (E.D.Mich., Jan. 11, 1978). *See generally McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919 (5th Cir. 1977) (reh. en banc) *vacating in part* 526 F.2d 870 (5th Cir. 1976).

Furthermore, since 42 U.S.C. § 1986—the basis for count 2 of defendants' counterclaim—is necessarily contingent on the existence of a cognizable § 1985(3) claim, that count will also be dismissed for failure to state a claim.

It is therefore

ORDERED

Plaintiff's April 28, 1978 motions to dismiss defendants' counterclaim for lack of jurisdiction and failure to state a claim granted.

## APPENDIX

The pertinent portions of the counterclaim read as follows:

10. On information and belief, commencing in or about the summer of 1975 and continuing to date, IBP has unlawfully conspired with [other named co-conspirators] and committed overt wrongful acts pursuant to [the] conspiracy . . . all with an intent to deprive the class on whose behalf Counter-Plaintiffs sue of the equal protection of the laws or the privileges and immunities under the law afforded to citizens of the United States, both by statute and by the Constitution.

11. Commencing during the late summer or early fall of 1975 and continuing through the summer of 1977, IBP together with co-conspirators MASON CITY DRESSED BEEF, PACKING HOUSE & INDUSTRIAL SERVICES, INC. and CHARLES SYKES, have engaged in the following overt acts in furtherance of the conspiracy:

(a) Entered into a series of agreements highly favorable to IBP whereby IBP could retain effective control, particularly in the labor relations area, over [its] Mason City facility while at the same time creating a structure which enabled it to contend that it no longer owned or operated the facility.

(b) Advised the AMCBW–represented employees that IBP no longer was to be operating the facility, that the plant was to be shut down for an indefinite period of time for renovation, and terminated the employment of all workers employed at the facility.

(c) Resumed operations in the plant almost immediately, utilizing substantially all former IBP supervisory and clerical employees, while refusing to employ virtually all former IBP production employees represented by AMCBW. Instead IBP and its co-conspirators engaged in a costly and extensive process to hire new employees who ultimately worked at rates of pay, hours and under working conditions substantially inferior to those provided in the IBP–AMCBW contract.

(d) Imported into the facility and executed an agreement with a captive organization for the purposes of providing alternative representation for the employees of the Mason City facility.

(e) Ordered the Mason City facility closed and the plant razed following the issuance, after lengthy proceedings before an Administrative Law Judge of the National Labor Relations Board, of a Decision dated December 29, 1976 recommending that co-conspirators MASON CITY DRESSED BEEF and PACKING HOUSE & INDUSTRIAL SERVICES, INC. be required to withdraw recognition of the alternative labor organization, to bargain with an affiliated local of the AMCBW and to offer immediate reinstatement, with full back-pay, to all former IBP employees represented by the AMCBW.

12. Commencing during the summer of 1976 and continuing to date, IBP together with co-conspirators CHARLES SYKES and FARM PRODUCTS COMPANY, among others, have engaged in the following overt acts in furtherance of the conspiracy:

(a) IBP and SYKES, among others, commenced an elaborate series of maneuvers, involving the creation of corporations, and entry into agreements, and the like, all designed solely to create an entity which ultimately could assume operations in IBP's Special Fabrication Division [in Dakota City, Nebraska].

(b) On June 21, 1976 IBP laid-off all of the AMCBW–represented employees working in the Special Fabrication Division.

(c) By December 6, 1976 a separate Company, FARM PRODUCTS CO. had been created, IBP and FARM PRODUCTS had entered into a series of agreements highly favorable to IBP and which effectively preserved control for IBP, and FARM PRODUCTS commenced operation in place of the Special Fabrication Division of IBP.

(d) IBP, SYKES and FARM PRODUCTS attempted to import into the FARM PRODUCTS operation another union as the representative of the employees working there.

(e) Substantially all former IBP clerical and supervisory employees were utilized in the FARM PRODUCTS operation and while some AMCBW–represented employees were permitted to work for FARM PRODUCTS, many of AMCBW–represented employees were never permitted to work for FARM PRODUCTS. Additionally, the wages, hours and working conditions at FARM PRODUCTS were substantially inferior to those provided in the last AMCBW–IBP agreement.

(f) On or about December 20, 1977, shortly after having learned that an unfair labor practice complaint was to issue against FARM PRODUCTS, IBP, acting under its agreements with FARM PRODUCTS, terminated its lease with FARM PRODUCTS and ordered it to cease operations. IBP immediately resumed operations under its own name in the Special Fabrication Division, and, at the same time, resumed operations in its slaughtering and processing departments for the first time since the commencement of the strike [at IBP's Dakota City facility] alleged in paragraph 9, *supra*. In commencing its own operations on December 20, 1977 IBP utilized all FARM PRODUCTS personnel.

13. All of the actions taken by IBP were deliberate, and were taken with an invidious discriminatory intent against the class represented by the Counter-Plaintiffs, to wit, the members of and those seeking to be associated with the AMCBW, and with the intent and purpose of destroying the AMCBW as an organization and as a means of exercising their rights under the Constitution and the law.

14. By reason of the foregoing wrongful acts of IBP and its co-conspirators, the class represented by the Counter-Plaintiffs has been damaged in the following respects:

(a) By reason of the conduct and conspiracy alleged in paragraphs 11 and 12, *supra*, the class has been deprived of rights, privileges and immunities under the First and Fourteenth Amendments of the Constitution of the United States to associate with, become and remain members of the AMCBW and under the labor laws it has been denied the benefits of bargaining rights and its rights to freedom from coercion and discrimination. Additionally, members of the class have been deprived of their right to earn a livelihood, and have been wrongfully discharged, blacklisted and otherwise threatened, harassed, intimidated and discriminated against. Finally, the conduct alleged threatens to deny members of the class their statutory right to back-pay and will deny them their statutory right to reinstatement.

(b) By reason of the conduct and the conspiracy alleged in paragraphs 11 and 13, *supra*, the class has been deprived of rights, privileges and immunities under the First and Fourteenth Amendments to the Constitution of the United States to associate with, become and remain members of the AMCBW and under the labor laws has been denied the benefits of bargaining rights and its rights to freedom from coercion and discrimination. Members of the class have also been denied their right to the fruits of their collective bargaining agreement, including, *inter alia*, the wages, hours and working conditions established therein, their right to be free from termination except for just cause, and the right to be free from lay-off except that legitimately motivated

and accomplished in a reverse order of seniority. Additionally, members of the class have been denied a right to earn a livelihood, and they have been wrongfully discharged, blacklisted and otherwise threatened, harassed, intimidated and discriminated against. Finally, the conduct alleged was a principal element of IBP's strategy in anticipation of a possible strike. By utilizing FARM PRODUCTS to maintain production and as a means of recruiting potential strikebreakers, IBP was able to use unlawful means to withstand the economic pressures imposed by said strike, thus denying the class the fruits of collective bargaining and necessarily diminishing the benefits which might be achieved from the strike.

(c) By reason of the conduct and the conspiracy alleged in paragraphs 11, 12 and 13, *supra*, and IBP's intent to utterly destroy the AMCBW, the Union to which the class either seeks to or does belong,

the class has been denied in locations other than those identified above all of the associational rights to which it would be otherwise be [sic] entitled in that IBP's wrongful conduct threatens to inhibit and has inhibited others from associating with members of the AMCBW. Additionally, it has denied the class of all the fruits of collective bargaining to which it is entitled, since the wages, hours and working conditions IBP has been able to maintain by reason of its wrongful conduct have had the inevitable effect of diminishing what is obtainable elsewhere. . . ."